U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2019 JUN 21  PM 12: 42

CLERK

BY_____

DEPUTY CLERK

U.S. DISTRICT COURT
FOR THE DISTRICT OF VERMONT

|  |  |  |
|---|---|---|
| DISABILITY RIGHTS VERMONT, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STATE OF VERMONT, | ) | Docket No  5:19-cv-106 |
| DEPARTMENT OF CHILDREN | ) | |
| AND FAMILIES, | ) | |
| KEN SCHATZ, COMMISSIONER, | ) | |
| in his official capacity, | ) | |
| JAY SIMONS, WOODSIDE JUVENILE | ) | |
| REHABILITATION CENTER | ) | |
| DIRECTOR, in his official capacity, | ) | |
| Defendants | ) | |

## VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1. Children with disabilities are held by the State of Vermont Department of Children and Families ("DCF") at the Woodside Juvenile Rehabilitation Center ("Woodside") in dangerous conditions that are physically and emotionally harmful. Despite repeated and persistent demands from the children, their representatives, licensing and accrediting agencies and stakeholders, the Defendants have failed or refused to substantially change their practices, policies, and customs as needed to protect the children in their care and custody.

2. This action is brought by Plaintiff Disability Rights Vermont ("DRVT"), on behalf of those children, asserting associational and organizational standing to seek declaratory and injunctive relief pursuant to the First and Fourteenth Amendments to the United States Constitution, 42 U.S.C. §1983, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12182 et seq., the Rehabilitation Act, 29 U.S.C. § 794 et

Disability Rights Vermont
141 Main Street / Ste. 7
Montpelier, VT 05602
(802) 229-1355

1

seq., to, inter alia, require the Defendants to correct the unconstitutional and unlawful conditions at Woodside that pose a serious risk to the children with disabilities residing there.

## PARTIES

3.     Defendant DCF is the State agency responsible for, inter alia, protecting and promoting the welfare of children in Vermont, and operating and regulating Woodside pursuant to 33 V.S.A. §§4903, §5801(a).

4.     Defendant DCF and Woodside are public entities as defined under Title II of the ADA, 42 U.S.C. §12131(1)(B).

5.     Defendant DCF receives federal funding.

6.     Defendant Ken Schatz is the Commissioner of DCF.

7.     Defendant Ken Schatz has final responsibility for children placed at Woodside pursuant to 33 VSA §105. He is responsible to ensure that Woodside is operated in a manner that is consistent with the United States and Vermont Constitutions and all applicable state and federal laws.

8.     Defendant Jay Simons is the Director of Woodside.

9.     As the Director of Woodside, Defendant Simons is charged with the overall responsibility for the operations and safety of the children there.

10.     Plaintiff DRVT is a non-profit organization designated by the Governor of Vermont as the State's Protection and Advocacy system. DRVT's mission is to promote the equality, dignity, and self-determination of people with disabilities. Plaintiff carries out the mandate of Congress pursuant to, inter alia, 42 U.S.C. §10801 et seq.; 42 U.S.C. §15001 et seq.; 29 U.S.C. §794e.

Disability Rights Vermont
141 Main Street / Ste. 7
Montpelier, VT 05602
(802) 229-1355

11.     Consistent with its authorities and responsibilities under federal law, for many years Plaintiff DRVT has conducted outreach, monitoring and advocacy work at Woodside on behalf of the children held there. This has included regular group and individual meetings with children placed there, issuing public and private reports on investigations conducted at Woodside, and representing individual children in grievances regarding their conditions of confinement.

12.     All children with disabilities currently residing at Woodside and children who will reside at Woodside in the future are members and constituents of Plaintiff because they are individuals with disabilities residing in Vermont and because Plaintiff has provided direct services to this population in the past and will continue to do so at the level required to redress rights violations.

13.     Plaintiff DRVT is constituted according to federal Protection and Advocacy regulations and obtains funding that is specifically allocated to protect and advocate for the rights of people with disabilities.

14.     Plaintiff receives more requests for service each year than funding and resources allow it to serve, and therefore Plaintiff refers many inquiries to other service providers or avenues for resolution.

15.     Plaintiff has had to divert significant resources away from other work and requests for service in order to investigate and attempt to remedy the ongoing violations of rights of children with disabilities at Woodside. This diversion has caused harm to Plaintiff in that other services and assistance to people with disabilities had to be delayed or refused in order to uncover and remedy Defendants' unlawful acts.

Disability Rights Vermont
141 Main Street / Ste. 7
Montpelier, VT 05602
(802) 229-1355

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§1331, 1343(a) (4), 2201 and 42 U.S.C. §12133.

17.     Venue is proper in this Court under 28 U.S.C. §1391(b) as the actions giving rise to this claim originate in the District of Vermont and all parties are residents in the District of Vermont.

## FACTUAL ALLEGATIONS

### Background of Woodside

18.     Woodside is operated by the DCF as a 30 bed residential treatment facility for boys and girls in Colchester, Vermont that provides in-patient psychiatric, mental health, and substance abuse services in a secure setting for adolescents who have been adjudicated or charged with a delinquency or criminal act pursuant to 33 V.S.A. § 5801.

19.     The facility was originally used as a secure detention and long-term custody facility for youth who were awaiting trial or had been adjudicated delinquent and was repurposed in 2011 as a secure facility focused on treatment of court involved youth with mental and emotional disabilities.

20.     The current purpose of Woodside cannot be changed without Legislative approval and only after a study recommending the change. 33 V.S.A. § 5801.

21. Woodside is divided into three living units for residents. The East and West units house the majority of the residents at Woodside. The resident rooms on these units have cinderblock walls, a narrow window facing outdoors, and locking steel doors. The rooms contain a bunk and a desk made out of a hard, unbreakable composite material.

Disability Rights Vermont
141 Main Street / Ste. 7
Montpelier, VT 05602
(802) 229-1355

The East and West units have communal bathrooms and showers, so residents must be allowed out of their rooms in order to use the restroom and bathe. The North Unit is used to house the most acutely mentally ill residents. It contains three resident rooms and a bare seclusion room. The resident rooms in the North Unit have sinks and toilets, meaning that residents do not have to be allowed out to use the bathroom. These rooms have the same cinderblock walls, narrow exterior windows, and locking steel doors. The North Unit also contains a windowless "dayroom" with a shower and table bolted to the floor. The three doors leading to and from the North Unit are locked whenever the residents are awake. Residents placed in the North Unit may not leave their cells for days at a time, and they may not leave the confines of the North Unit for days, weeks, or months.

22.     All children residing at Woodside are in Defendant DCF's custody.

23.     Pursuant to DCF Family Services Division Woodside Policy 399 Woodside serves youth ages 10 to 18 who are exhibiting self or other harming behavior(s) requiring significant treatment intervention and for whom, without continued intervention in a secure treatment setting, there is reason to believe the youth will experience further serious deterioration of their mental health condition.

24.     Children are held at Woodside if they are ordered there by a Court prior to a Disposition Hearing and with Defendant DCF's recommendation or placed there after Disposition by Defendant DCF's administrative process.

25.     Until Defendant DCF recently abandoned its effort to fund Woodside through Medicaid funds, in order to remain at Woodside, children had to be clinically certified to require residential mental health treatment pursuant to Family Services

Disability Rights Vermont
141 Main Street / Ste. 7
Montpelier, VT 05602
(802) 229-1355

5

Policy 171.

26.     On information and belief, all children residing at Woodside have a diagnosed mental health condition or developmental or intellectual disability.

27.     All children at Woodside are qualified to receive and benefit from programs, services and activities at Woodside provided by the State of Vermont, including but not limited to interacting with peers in a therapeutic milieu, socialization with peers, learning self-advocating skills through utilization of the grievance process, access to supervised outdoor activities, adequate mental health treatment to prevent unnecessary isolation or other deprivations of liberty or property, therapeutic groups, education, recreational activities,  meals in a social milieu, and freedom from unnecessary restraint and isolation.

28.     Treatment facilities in Vermont are all regulated by a state agency to ensure compliance with state and federal regulations.

29.     While Woodside is regulated by a state agency, it is in the unique position of being regulated by the same state agency that runs the facility, DCF.

30.     In regulating Woodside, DCF has allowed for continued variances and lack of enforcement on many standards enforced regularly in other treatment settings.

### Defendants are on Notice of Imminent Threat of Harm to Children with Disabilities Placed at Woodside

31.     Defendants have been aware since at least early 2018 that policies, practices and customs at Woodside were below the standard of care and harmful to children with disabilities, resulting in unnecessary and painful restraint, dangerous and often unsupervised seclusion, harmful long term isolation and deprivation, and failure

Disability Rights Vermont
141 Main Street / Ste. 7
Montpelier, VT 05602
(802) 229-1355

to provide adequate mental health treatment in order to avoid such deprivations, and failure to transfer children to a hospital when the child was so acutely ill that they remained an imminent threat of serious harm.

32.     Defendants' knowledge of these problems derived from public reporting, Motions for Protective Orders filed by the Office of the Juvenile Defender, grievances filed by Woodside residents, and the findings of Defendant DCF's own Residential Licensing and Special Investigations ("RLSI") Unit issued in October 2018.

33.     Plaintiff DRVT also met with Defendants throughout the Winter of 2018-2019 to emphasize its concerns and attempt to remedy them.

34.     In April 2019, Defendants were sued by the Office of the Juvenile Defender on behalf of one child with disabilities at Woodside in State Superior Court regarding the inhumane use of pain compliance restraints at Woodside.

35.     Despite the knowledge of the problems and the potential serious impact on children at Woodside, Defendants have failed to effectively prevent the harms identified by experts and stakeholders and Defendants' own RLSI.

### Examples of Harms and Risks Known to Defendants

**RLSI Reports** (May-October 2018)

36.     The RLSI Unit is the designated licensing authority within DCF, Family Services Division.

37.     Pursuant to DCF FSD Policy 220 (2002) RLSI investigates and reports on regulatory violations occurring in Woodside.

38.     In October 2018 RLSI issued 11 separate reports finding significant violations of Vermont regulations regarding Woodside staff's treatment of six

individual children. At the time of the reported events, there were less than 12 children placed at Woodside.

39.     These October 2018 RLSI reports identified several instances of unnecessary use of restraints, excessive use of restraints, unnecessary uses of seclusion and isolation, failures to properly supervise children in seclusion or isolation, subjecting children to inhumane and degrading conditions, and inadequate mental health treatment of actively suicidal children.

40.     The RLSI reports also commented that the restraint modality used at Woodside is dangerous.

41.     The RLSI reports also commented that Woodside has a dysfunctional grievance system that is ineffective and disempowers the children.

42.     Defendants met with Plaintiff and other stakeholders on October 23, 2018 and acknowledged the RLSI reports briefly, promising to provide a considered response to the findings of violation before the identified deadline of November 16, 2018.

43.     Plaintiff, through counsel, notified Defendants DCF and Schatz on November 2, 2018 that it believed there to be immediate risk of harm to children at Woodside based on the October 12th RLSI reports and other information, and urged Defendant Schatz to take prompt remedial action.

44.     On Nov 16, 2018 Defendants issued their response to the October 2018 RLSI findings of regulatory violations.

45.     Defendants denied any systemic or significant problems were identified by the October RLSI findings of violations and instead seemed to attack the

professionalism of the RLSI staff.

46.     One RLSI report found that on June 27, 2018 Defendants' staff had

injured  JUVENILE 4 while violating governing Residential Treatment Program

Regulations VT ADC 12-3-508: 201 (to ensure children are free from harm and from

unnecessary or excessive use of restraint or seclusion/isolation), 648 (prohibit cruel,

severe, unusual or unnecessary restraint and seclusion/isolation practices) and 651

(Restraint will only be used to insure immediate safety of child or others and no less

restrictive alternative is likely to be effective as a last resort to avoid the danger).

47.     This report described a chaotic situation where staff were overwhelmed

by the children's allegedly orchestrated behavior that resulted in one child being able to

attempt an escape while another was in a sally port preventing staff movement within

the facility and other children were in their unit causing a disturbance.  The RLSI report

found that, in part, this chaos was allowed to occur due to Woodside staff's

unprofessional conduct, including causing the sally port door to remain open and

unguarded so that one child could enter and occupy it and by angrily approaching

JUVENILE 4, rather than focusing on other children who were more appropriate to

engage with, thereby exacerbating the entire situation.

48.     Specifically, RLSI found a violation for unnecessary use of force against

JUVENILE 4 after two male staff members charged her, tipping over chairs as they

progressed angrily towards her where she was backed up against a wall. At the time, she

was engaged in minor property damage but was not a safety risk. The RLSI report states

that the video evidence of this incident supports JUVENILE 4's assertion that her

action of punching these staff as they came at her was self-defense and as such not a

Disability Rights Vermont
141 Main Street / Ste. 7
Montpelier, VT 05602
(802) 229-1355

justification to use force against her. RLSI goes on to identify regulatory violations

from the use of force then used against her, including a knee to her back and dragging

her on the floor by her feet, which caused friction burns. RLSI noted that the restraints

used on JUVENILE 4 were dangerous and out of control and were applied contrary to

policy and training.

49.     Defendants responded to RLSI's findings of violations regarding

JUVENILE 4 by denying the validity of the RLSI findings and accusing RLSI staff of

failing to appreciate the seriousness of the allegedly coordinated disturbance within the

facility on June 27, 2018. Defendants' failed to respond to RLSI's findings of

unprofessional conduct by the operations supervisor on duty.

50.     Three additional RLSI reports found that another child with disabilities,

JUVENILE 5, had been subjected to numerous instances of harmful conduct between

May 2018 and August 2018 in violation of applicable regulations.

51.     RLSI cited Woodside for a regulatory violation after finding that

JUVENILE 5 had been subjected to inhumane, degrading conditions when she was

unnecessarily prohibited from using tampons and shaving at the same intervals as her

peers. VT ADC 12-3-508: 200 (201).

52.     Defendants' November 16th response to RLSI's findings regarding this

incident was to dispute the validity of RLSI's conclusions and reassert they had no duty

to provide JUVENILE 5 the normalcy of tampons and supervised shaving as her peers

enjoyed.

53.     RLSI found further regulatory violations relating to JUVENILE 5's June

12, 2018 suicide attempt and the failure of Defendants to provide adequate supervision

Disability Rights Vermont
141 Main Street / Ste. 7
Montpelier, VT 05602
(802) 229-1355

to JUVENILE 5 while she was in seclusion (Regulation 601), and Defendant's failure to obtain adequate emergency medical care after the suicide attempt (Regulation 635).

54.     RLSI found that Defendants provided inadequate supervision of JUVENILE 5 given her known history of recent suicide attempts. After consulting with Dr. Karyn Patno, a pediatrician who specializes in the diagnosis of child maltreatment, RLSI also found that Defendants prevented transport of JUVENILE 5 to the hospital for evaluation after her serious suicide attempt in violation of the prevailing standard of care. RLSI also noted concern that Defendants had misled staff from the local mental health agency about the severity of the suicide attempt further contributing to the failure to have JUVENILE 5 transported to the hospital for evaluation.

55.     Defendants' response to RLSI's findings of violations relating to JUVENILE 5's suicide attempt on June 12, 2018 was to deny any inappropriate supervision and fail to address the misleading statements that Defendants made to the mental health agency. Defendants did agree that in the future, children will be transported to the hospital for evaluation after a similar suicide attempt. Subsequent to this agreement, Defendants have failed to consistently transport children to the emergency department despite a number of significant suicide attempts in the facility since October 2018.

56.     The third investigation involving JUVENILE 5 concluded that Defendants secluded JUVENILE 5 without justification, forcibly removed her pants, and left her naked from the waist down in her cell for more than two days. During this two-day period, JUVENILE 5 was held in her cell with nothing more than a mattress. RLSI found Woodside in violation of numerous regulations, including Regulations 201

(human conditions, dignity and respect), 601 (adequate supervision), 648 (prohibiting cruel and unusual practices), 650 (approved restraint), 651 (restraint last resort and only to prevent immediate safety of resident or others), 660 (constant supervision of secluded children), and 718 (prohibiting using bedroom for seclusion/stripped cell).

57.    Specifically, RLSI found that JUVENILE 5 was disassembling her pants while unnecessarily secluded in the North Unit. Instead of trying to engage JUVENILE 5 in a therapeutic activity three male staff rushed into her room, used excessive force to pin her in the prone position, and took her pants even though she was not an immediate risk to herself.

58.    RLSI also found that Woodside staff misled RLSI investigators about this incident with JUVENILE 5 when they asserted force was needed to take her pants but evidence showed that JUVENILE 5 had already taken the pants off before the men entered her cell. RLSI also noted that usually staff would just look through the back window to make sure that the resident in seclusion was not self-harming and did not charge in until there was an actual imminent risk, but inexplicably failed to use this alternative in JUVENILE 5's case.

59.    RLSI's reports concerning JUVENILE 5 also found that Woodside's "use-of-force" protocol was dangerous and excessive, that Woodside failed to appropriately supervise JUVENILE 5 given her level of risk, and that Woodside unlawfully stripped JUVENILE 5's cell of all possessions to use it for seclusion.

60.    Defendants' response to the RLSI investigation of this incident again failed to address each of the serious allegations related to the regulatory violations. Instead, Defendants denied any wrong-doing asserting that RLSI failed to understand

the situation and justifying the inhumane treatment of JUVENILE 5 as necessary to prevent her from harming herself.

61.     Defendants did not identify or address why it was appropriate to keep JUVENILE 5 in seclusion, half naked, with no mattress for two days due to concern about her immediate risk of self-harm caused by her mental health condition instead of complying with Vermont law and having her transported to a hospital for evaluation and treatment.

62.     Pursuant to Vermont's Emergency Examination statute, 18 V.S.A. § 7505, JUVENILE 5 met criteria for transport and care in an emergency department of a hospital during this August incident.

63.     Another RLSI report found very similar violations to those above in regard to JUVENILE 3 and her experiences in May 2018, including finding violations of  Regulations 201(humane, dignity and respect), 648(no cruel and unusual practices), 650(approved restraint), 651(restraint only when necessary), 654(not using force for punishment/coercion), 660(constant observation when secluded).

64.     RLSI found that in May and June 2018, JUVENILE 3 had been subjected to numerous violations resulting in unnecessary physical and emotional harm. The RLSI report described a restraint occurring on June 11, 2018 where JUVENILE 3 was physically restrained and carried while shackled in handcuffs and leg irons for refusing to return to her room. During the restraint, JUVENILE 3 screamed in pain and shouted, "You're breaking my arm." The video showed that "restraint was not used as a last resort," that JUVENILE 3 was "clearly in pain throughout the restraint," and that staff put their knees in JUVENILE 3's back while she was being restrained in the prone

position. RLSI also found that JUVENILE 3 and other children at Woodside were unable to effectively voice their concerns about their treatment because the grievance system was dysfunctional. Finally, RLSI found that there was inadequate supervision of children in seclusion, including JUVENILE 3, due to Defendants' lack of understanding that a child is in seclusion whenever he or she is locked in a room or otherwise prevented from leaving an area. The RLSI report concerning JUVENILE 3 identified that the grievance system, use of force system, and understanding of the conditions that form seclusion and that require constant supervision all were inadequate at Woodside and required prompt and significant improvement.

65.     In response to the RLSI findings on JUVENILE 3, Defendants again failed to respond to all aspects of the concerns raised, disputed RLSI's interpretation of the regulations it is charged with enforcing, claiming that they did not seclude JUVENILE 3  unnecessarily or fail to provide her with appropriate supervision while she was in seclusion, and denied subjecting JUVENILE 3 to inhumane treatment or unnecessary restraint. Defendants only vaguely agreed to consider to 'examine' their use of force system.

66.     Another October 2018 RLSI report found that in April 2018, JUVENILE 2 experienced similar violations of  Regulations 201 (humane conditions, dignity and respect), 520 (adequate de-escalation plan), 648 (prohibiting cruel and unusual practices), 650 (approved restraint), 651(restraint last resort and only to prevent immediate safety of resident or others), 654 (use of restraint not for property damage, coercion or staff convenience), 660 (constant supervision of secluded children), 701 (functional toilet and sink) and 718(prohibiting using bedroom for seclusion/stripped

Disability Rights Vermont
141 Main Street / Ste. 7
Montpelier, VT 05602
(802) 229-1355

14

cell).

67.     This investigation found that JUVENILE 2 was covering his North Unit cell window with both hands (indicating he was not using his hands for self-harm). Woodside staff entered his cell with riot shields and proceeded to cut off his clothes and physically restrain him using pain compliance resulting in injuries to JUVENILE 2. Following this incident, JUVENILE 2 was kept secluded and shirtless overnight in a cold cell with no mattress or possessions. Staff also refused to provide him with drinking water and forced him to remain in a cell with an overflowing toilet even though other cells in the North Unit were available.

68.     RLSI further noted that the grievance system was ineffective because Defendant Simons' grievance response to JUVENILE 2 denying any wrongdoing was contradicted by video and other evidence. RLSI notes with alarm Defendant Simons' erroneous assertion that if a child is yelling "you're choking me," that means the child can breathe so there is no cause for concern. The RLSI report also found that JUVENILE 2 was afraid to file anymore grievances because staff had retaliated against him in the past for filing grievances.

69.     Defendants responded to the JUVENILE 2 RLSI findings of violations by again denying the validity of the RLSI findings. The only change Defendants agreed to make was to fix the toilet and water problems that RLSI had identified as leading to unsanitary conditions in the North Unit.

70.     The October 2018 RLSI reports also criticized Defendants for allowing humiliating behavior to occur by staff towards children, including allegedly not allowing children to discuss the resident handbook and punishing children who

Disability Rights Vermont
141 Main Street / Ste. 7
Montpelier, VT 05602
(802) 229-1355

discussed the handbook for non-existent rule violations.

71.    The October 2018 RLSI reports expressed concern about the grievance system being dysfunctional and reiterated a demand that a different and nationally-accepted de-escalation/use of force system be promptly implemented.

72.    In response to RLSI's findings of retaliation, Defendants asserted that children were merely perceiving retaliation as a result of the inherent power dynamics at play.

73.    In response to the numerous October 2018 RLSI findings noted in paragraphs above, Defendants have failed to act responsibly to immediately protect children at Woodside from the imminent risk of harm posed by continued use of that system and instead vaguely agreed to 'examine' their use of force policy.

74.    Defendants' November 16th responses to the October 2018 RLSI reports included no other concrete steps to remedy the violations found in the RLSI reports and in fact disputed the findings and legal analysis of RLSI.

75.    Defendants' November 16th responses to the RLSI reports also stated that they were not taking any corrective actions to the North Unit concerns until decisions were made about Woodside's future role in Vermont's system of care.

76.    On information and belief, over the past two decades, RLSI has identified numerous specific policies, practices and actions that have occurred at Woodside that are in violation of regulations governing the facility.

77.    On information and belief, in many of the situations when RLSI has found violations, Defendants have overridden RLSI and allowed the offending behavior by Woodside staff to continue unabated.

Disability Rights Vermont
141 Main Street / Ste. 7
Montpelier, VT 05602
(802) 229-1355

78.     As of this date, Defendants have not taken significant action to enforce remedies of the violations identified by the October 12, 2018 RLSI reports.

**Juvenile #1 v. Schatz** (2019)

79.     In April 2019, Juvenile #1 filed suit against DCF Commissioner Ken Schatz seeking injunctive relief to stop Woodside from subjecting him to pain compliance techniques, hyperextension of joints, and pressure on the torso during prone restraint. See Docket No. 192-4-19 Wncv.

80.     Juvenile #1 was 17 years old when he was subjected to several uses of force while held in the North Unit in March 2019.

81.     Juvenile # 1's lawsuit against Commissioner Schatz was dismissed on mootness grounds after he was discharged from Woodside.

82.     Before Juvenile # 1's lawsuit was dismissed, the Court denied the Defendant's Motion for a Directed Verdict under V.R.C.P. 52 (c) after Juvenile #1 presented his case in chief.

83.     During the five days of trial in Juvenile # 1's case, the testimony included Dr. Christopher Bellonci, a psychiatrist affiliated with Harvard Medical School and an international expert on residential treatment for behaviorally challenged adolescents, Paul Capcara, a Registered Nurse with extensive experience managing inpatient psychiatric units for adolescents and adults, and Brenda Dawson, a senior investigator from Defendant DCF who investigated Woodside for RLSI, and an operations supervisor from Woodside.

84.     Dr. Bellonci and Mr. Capcara testified consistently that their extensive review of aspects of treatment for several children at Woodside caused them to have

Disability Rights Vermont
141 Main Street / Ste. 7
Montpelier, VT 05602
(802) 229-1355

serious concerns for the health and safety of those children due to the lack of adequate training, mental health treatment, de-escalation and use of force systems, and the over use of seclusion, isolation and force in harsh circumstances.

85.     Specifically, regarding Juvenile #1, Dr. Bellonci and Mr. Capcara agreed that Woodside staff had maintained Juvenile #1 in a secluded or isolated environment for several days leading up to the restraint at issue in the trial, opining that the use of seclusion was excessive and harmful to Juvenile #1.

86.     Dr. Bellonci and Mr. Capcara described how the use of force used on Juvenile # 1 included a "middle block," a physical intervention where an operations supervisor who was nearly twice Juvenile #1's size forcefully shoved him across the room, lifting him off both feet and sending him crashing into his bunk, the cinderblock wall, or both. Thirty minutes after the "middle block," a team of three staff members, including the operations supervisor, restrained Juvenile #1 face down, with his arms hyperextended and twisted behind his back, his legs crossed and pushed hard into his back, and some pressure on his neck and back. Staff then escorted Juvenile #1 to an isolation cell where they continued to restrain him on the floor while twisting his arms and pushing his feet into his buttocks. During the escort, staff members' hands slipped up around Juvenile #1's throat, essentially creating a "chokehold" and causing Juvenile #1 to gag, gasp, and cough.

87.     Both Dr. Bellonci and Mr. Capcara agreed that Juvenile #1 was subjected to force unnecessarily because once staff identified that he was safe, there was no longer a need to confront him, and that the techniques staff used to control him caused needless pain.

Disability Rights Vermont
141 Main Street / Ste. 7
Montpelier, VT 05602
(802) 229-1355

88.     Both Dr. Bellonci and Mr. Capcara also testified that in their medical opinions, the use of force techniques used were inappropriate and dangerous creating a high risk of severe physical and psychological injuries.

89.     They further testified that the situation was exacerbated by the lack of adequate mental health treatment, training and supervision.

90.     After Dr. Bellonci and Mr. Capcara's testimony, Ms. Brenda Dawson testified in support of her work regarding the October 2018 RLSI reports finding violations in terms of overuse of seclusion, isolation, unnecessary and excessive restraint, retaliation, and calling for an improved use of force system.

91.     Ms. Dawson testified that no other residential program in Vermont had disputed RLSI's findings as Woodside had. She also testified that continued violations or a failure to redress significant violations could result in shutting down the program. Ms. Dawson then acknowledged she did not have the ability to shut down Woodside for ongoing regulatory violations.

**Juvenile 6 April 2019**

92.     In two incidents in April 2019 (April 14 and 29) Woodside staff unnecessarily restrained Juvenile 6 using the same pain compliance techniques and prone positioning used on Juvenile #1 v. Schatz (2019) and described in the RLSI reports.

93.     Woodside staff also used handcuffs on Juvenile 6 in both incidents.

94.     Dr. Bellonci reviewed video recordings and records relating to these two incidents and identified the continuing pattern of Defendants exacerbating or instigating a resident into aggression and then using restraint unnecessarily and in a punitive,

Disability Rights Vermont
141 Main Street / Ste. 7
Montpelier, VT 05602
(802) 229-1355

painful manner that is below the standard of care and harmful to Plaintiff's constituents.

**Juvenile 7 November 2018**

95.     Juvenile 7 was restrained in November 2018 ostensibly for throwing water on a staff person at Woodside.

96.     The restraint on Juvenile 7 also involved the use of prone positioning, hyperextension of arms behind the child's head, and twisting and pushing the child's feet into his back.

97.     Dr. Bellonci reviewed the video and records of this incident as well and again opined that Woodside staff failed to use appropriate de-escalation efforts to avoid the use restraints and that the restraint techniques were punitive and caused pain and trauma to the child.

**Juvenile 8 June 2019**

98.     Juvenile 8 was held in Woodside's North Unit for several days in early June 2019 after she attempted to hurt herself and Woodside staff. On June 4, 2019, Woodside staff restrained Juvenile 8 for non-compliance and property destruction. During the restraint, staff carried Juvenile 8 down a flight of stairs, placing her at significant risk of serious physical injury. Juvenile 8 was then placed in seclusion for approximately two hours, even though she was no longer exhibiting unsafe behavior. Woodside also forced Juvenile 8 to use a "diva cup" to contain her menstrual flow. A "diva cup" is a silicone cup that is inserted into the vagina and must be removed, emptied, and cleaned regularly. According to Juvenile 8, Woodside staff claimed that both tampons and sanitary napkins posed a "safety risk," so Juvenile 8 would not be allowed to use those items.

Disability Rights Vermont
141 Main Street / Ste. 7
Montpelier, VT 05602
(802) 229-1355

99.     While in the North Unit, Juvenile 8 attempted to strangle herself at least four times resulting in the breaking of blood vessels in her eyes. In response, Woodside staff pinned Juvenile 8 in the prone position on her bunk and forcibly removed her clothing in order to place her in a "safety smock." The "safety smock" is made of rough, difficult-to-tear fabric and is intended to provide coverage of the wearer's breasts and genitals while deterring self-harm.

100.     Juvenile 8 was screened by qualified mental health professionals and deemed eligible for inpatient psychiatric care.

101.     Despite this notification that Juvenile 8 was requiring inpatient psychiatric care, Defendants continued to hold Juvenile 8 in the North Unit for days, Defendants knowing that this was not an appropriate therapeutic environment and not augmenting in any significant way the mental health treatment available to her.

102.     The following day, on June 5, 2019, Juvenile 8 covered the window on the door of her cell and hid under her safety blanket. When she used string from her "safety smock" to fashion a ligature, staff restrained Juvenile 8, cut off the ligature, and took Juvenile 8's safety smock, leaving her completely naked. Juvenile 8 was forced to remain in her cell, under constant observations by male staff.

103.     Several days after the initial assessment that Juvenile 8 was in need of inpatient psychiatric treatment, on June 9, 2019, she once again attempted significant self-harm. While locked in her room, she attempted to swallow her diva cup, and staff restrained her and administered back blocks in order to dislodge the diva cup from her throat. While still locked in her room, Juvenile 8 began to repeatedly smash the back of her head into the steel door.

104.     Almost twelve hours after the incident with the diva cup, Juvenile 8 was transported to the Emergency Department at the University of Vermont Medical Center with the plan to hold her there until a bed became available at Vermont's only psychiatric inpatient hospital for children, the Brattleboro Retreat.

105.     After being held at UVMC's Emergency Department for approximately 5 days, the Brattleboro Retreat refused to take her on one of their inpatient units, so Juvenile 8 is now back at Woodside in the North Unit in the same situation as in early June.

106.     There is currently no effective plan to remedy this ongoing and imminently dangerous situation for Juvenile 8.

107.     Dr. Bellonci has reviewed some clinical records relating to Juvenile 8 and has identified concerns consistent with his prior opinions in terms of inadequate mental health resources at Woodside, overuse of seclusion and isolation, and potential for dangerous use of force implementation in unnecessary or even necessary situations.

### Woodside's Uses of Force/ Physical Restraints in Unnecessary Situations is Harmful

108.     Experts recognize that physical and mechanical restraint of children, including seclusion and isolation, can cause physical, psychological, and emotional damage and may make a difficult situation worse, increasing agitation and violence and occasionally resulting in permanent injury or death.

109.     In recognition that using force against children with disabilities is a dangerous intervention, a professional consensus has developed about its use.

110.     The Defendants are or should be aware of this professional consensus.

Disability Rights Vermont
141 Main Street / Ste. 7
Montpelier, VT 05602
(802) 229-1355

111.    The professional consensus on the use of force on psychiatric patients, especially children, is that such procedures are only to be used to prevent imminent harm to the patient or others and only if less restrictive alternatives would be ineffective, and if used, the use of force or seclusion must be ended at the earliest reasonable time. This professional consensus is expressed, inter alia, in the following standards: 42 U.S.C. § 290ii (b); 42 C.F.R. § 483.356; 42 C.F.R. § 483.358; 12-6 Vt. Code R. § 6:3; 12-3 Vt. Code R. § 508 (650), (659); American Psychiatric Nurses Association Position on the Use of Seclusion and Restraint (2018), available at https://www.apna.org/i4a/pages/index.cfm?pageid=3728#PositionStatement.

112.    Defendants are well aware that restraints are routinely used at Woodside in situations where it is wholly unnecessary or in situations exacerbated by staff.

113.    The professional consensus is that restraint and seclusion may only be ordered by a medical doctor or, if one is unavailable, by an authorized qualified person and reviewed by and the person restrained examined by a medical doctor within one hour of the order.

114.    Restraints and seclusions at Woodside are routinely initiated by non-medical personnel without any educational background in children mental health, and the children are not evaluated face-to-face within one hour by a physician, physician assistant, advanced practice registered nurse, or a specially trained registered nurse.

115.    With Woodside as the sole exception in Vermont, restraint and seclusion policies in mental health facilities in Vermont conform to the professional consensus on the use of restraint and seclusion. Vermont Department of Mental Health's Statewide Standards for Emergency Involuntary Procedures.

https://mentalhealth.vermont.gov/sites/dmh/files/documents/Manuals/EIP_Rule_FINAL
_2016.pdf.

116.    Unlike any other treatment setting in Vermont for adolescents,

Defendants have allowed Woodside to lock children with disabilities in their rooms at

night (seclusion), for ninety minutes of "quiet time" each night, and at other times for

staff convenience. Woodside has also allowed the use of riot shields and metal

handcuffs against residents.

### Woodside's Use of Force Modality is Harmful

117.    Defendant Simons personally developed the use of force/de-escalation

intervention techniques currently utilized at Woodside, referred to as "Dangerous

Behavioral Control Techniques", based in part on his experience working in adult

correctional institutions.

118.    The use of force/de-escalation intervention strategies developed by

Defendant Simons are not evidence-based, peer-reviewed, nor nationally recognized

and are not used in any other treatment setting than Woodside.

119.    Defendant Simons trains, supervises, participates in some and reviews all

the uses of force at Woodside.

120.    The use of force/de-escalation intervention strategies developed by

Defendant Simons involve the use of pain to coerce compliance such as twisting arms

and applying rotational force to shoulders (hyperextension of joints) and other joints;

the use of a dangerous prone positioning technique; and authorizes the use of riot gear

such as riot shields and hard metal handcuffs.

121.    This technique can be expected to cause pain, regardless of whether the

Disability Rights Vermont
141 Main Street / Ste. 7
Montpelier, VT 05602
(802) 229-1355

child is resisting.

122.    A senior Woodside staff member acknowledged under oath in the trial of Juvenile #1 v. Schatz that it is very common for children to scream and talk about how much pain they are in when being restrained using the current method.

123.    Applying downward pressure to the upper torso while a person is being restrained in the prone position can result in positional asphyxiation and death and escorts should be avoided due to their association with staff and youth injuries, but Defendants often use prone restraints and escorts unnecessarily.

124.    Defendants have a practice at Woodside that utilizes riot gear, called personal protective equipment, including riot shields, gloves, helmets, and hard metal handcuffs, when restraining and secluding children.

125.    This riot gear can cause physical and psychological damage to children and has no place in a therapeutic setting.

126.    Defendants are aware of the dangers but continue to use these restraint techniques.

127.    For many years, Defendants have been aware of nationally recognized systems of physical restraint and de-escalation but rejected use of such a nationally recognized systems in favor of the system developed by Defendant Simons because it was more forceful.

128.    In an accreditation report of Woodside issued on September 13, 2018 by the Commission on Accreditation of Rehabilitation Facilities (CARF), a nationally recognized independent accreditor of human services programs like Woodside, CARF suggested that Woodside "eliminate all outdated policies associated with use of force or

Disability Rights Vermont
141 Main Street / Ste. 7
Montpelier, VT 05602
(802) 229-1355

a correctional approach to aggression management and to consider revising current seclusion/restraint procedures to reflect only those nonviolent practices and training that are authorized and considered to be acceptable practices to use within [Woodside]."

129.    RLSI for years has been strongly encouraging Woodside to adopt a nationally recognized use of force modality.

130.    Notwithstanding the recommendations of accreditors and licensors, Defendants have not adopted a nationally-recognized use of force/physical restraint modality.

131.    While Defendants did employ a consultant on this issue in April 2019, they have taken no concrete steps to change use of force/physical restraint practices at Woodside.

132.    In addition to the unacceptable and outlier use of force system in place at Woodside, Defendants also utilize an outlier and inappropriate 56-hour staffing pattern at Woodside that is inconsistent with practices at residential psychiatric treatment facilities and often results in staff working with children for more than eight hours at a time and not getting enough rest to be optimally functional.

133.    This staffing pattern deprives staff of the ability to rest and recuperate resulting in more aggression and less patience when interacting with the child residents.

134.    The children at Woodside have noted and are aware that some staff become more aggressive and demanding when the staff have been working for more than eight hours. Accordingly, they attempt to avoid contact and conflict with those staff in order to avoid abuse or retaliation, such as privilege reduction or seclusion.

Disability Rights Vermont
141 Main Street / Ste. 7
Montpelier, VT 05602
(802) 229-1355

## Seclusion and Isolation is Overused and Harmful

135.    Seclusion is placing a child in a room by himself or herself from which he or she cannot leave.

136.    Children are isolated when they are with a staff person but prevented from having contact with peers or from freedom of movement within the facility.

137.    Like restraint, seclusion, must only be ordered and applied in emergency situations. See, e.g., 42 U.S.C. § 290ii (b); 42 C.F.R. § 483.356; 42 C.F.R. § 483.358. See also regulations of the Vermont Department of Mental Health.12-6 Vt. Code R. § 6:3; 12-3 Vt. Code R. § 508 (659); American Psychiatric Nurses Association Position on the Use of Seclusion and Restraint (2018), available at https://www.apna.org/i4a/pages/index.cfm?pageid=3728#PositionStatement; Woodside policy 509.

138.    Seclusion, isolation and deprivation of property and materials are used too much at Woodside, in lieu of adequate staffing and treatment, and these practices are harmful to the psychological wellbeing of the children.

139.    Like restraint, seclusion or isolation can cause physical, psychological and emotional harm and may actually exacerbate a difficult situation and therefore experts agree it is to be regulated and only applied to children with mental health disabilities when no reasonable alternative exists and must be ended at the earliest time possible.

140.    A number of national organizations have concluded that solitary confinement should never be used for minors. For example, standards published by NCCHC require that youth "should be excluded from solitary confinement of any

Disability Rights Vermont
141 Main Street / Ste. 7
Montpelier, VT 05602
(802) 229-1355

duration." The American Medical Association and the AACAP similarly oppose the use of solitary confinement for children and adolescents. JDAI has published comprehensive standards that prohibit the use of solitary confinement as a disciplinary measure or for any reason "other than as temporary response to behavior that threatens immediate harm to a youth or others." These standards state that facilities should "not use room confinement as a substitute for special individualized programming," including educational services and treatment plans developed with mental health staff and the youth's family members. If a young person is placed in isolation, JDAI standards require that the isolation last no longer than four hours and that staff develop individualized programming for the youth or "consult with a qualified mental health professional about whether a youth's behavior requires that he or she be transported to a mental health facility." The NCCHC, has recognized that "children are different from adults, making their time spent in isolation even more difficult and the developmental, psychological, and physical damage more comprehensive and lasting. They experience time differently—a day for a child feels longer than a day to an adult—and have a greater need for social stimulation." AACAP has similarly concluded that, "due to their 'developmental vulnerability,'" adolescents are at particular danger of adverse reactions, including depression, anxiety, and psychosis, when exposed to prolonged isolation and solitary confinement.

141.    Solitary confinement also is antithetical to the goal of maintaining safety and security in juvenile detention facilities. When a child is experiencing anger as a symptom of mental illness, use of solitary confinement often results in additional anger, and additional time in solitary confinement. According to the CJCA, "[a]cademic

research continues to show that placing incarcerated youths in isolation has negative public safety consequences, does not reduce violence and likely increases recidivism." Further, "[t]here is no research showing the benefits of using isolation to manage youths' behavior." By contrast, facilities that have reduced or eliminated the use of solitary confinement have seen a reduction in violence and infractions. These facilities have ensured that separation only occurs after multiple attempts to defuse tensions, and not as an alternative for controlling the manifestations of mental illness.

142.    Seclusion requires constant supervision and qualified mental health clinicians should do frequent rounds to assess the mental and physical condition of children in seclusion.

143.    Children at Woodside are not always under constant supervision when they are secluded and often do not have frequent contact with mental health clinicians while secluded, creating a dangerous situation for the children that has resulted in injury.

144.    Many children with mental illness often have a difficult time conforming their conduct to Woodside's disciplinary rules because of their illness; in consequence, youth are often secluded or isolated as a result of their illnesses. Defendants' failure to provide sufficient mental health services to these youth also results in symptomatic behavior giving rise to punishment, instead of the treatment that is needed. These punishments result in long-lasting and substantial harm to all children and are particularly harmful to children already suffering from significant mental illness. Defendants' practices with respect to these punishments substantially depart from accepted professional standards for juvenile treatment facilities and expose children at

Disability Rights Vermont
141 Main Street / Ste. 7
Montpelier, VT 05602
(802) 229-1355

Woodside to substantial risks of serious harm.

## Woodside's North Unit

145.    Woodside's North Unit is used for seclusion and isolation pursuant to Woodside Policy 502.

146.    The North Unit consists of a windowless "day room" containing a shower and a table, three "wet rooms" containing a sink and toilet, and a padded isolation room. The walls are bare. The "wet rooms" are approximately eight feet by ten feet and have steel doors that lock from the outside, small windows, and cinderblock walls. Each room also contains a "bunk" made of a hard, plastic material. A small hallway connects the isolation room, the "day room," and the three "wet rooms." On one end, the hallway abuts a solid, steel door that is secured with a padlock at all times. On the other end, the hallway abuts a steel door that can be locked and unlocked remotely and leads into a conference room. This door has a window, but the window is frequently covered with paper to prevent residents in the North Unit from having contact with residents in the conference room.

147.    When children are placed in the North Unit, they are isolated from their peers, deprived of property, and often deprived of access to educational services and opportunities for recreation.

148.    Children confined to the North Unit are either locked alone in their cell, allowed to walk in the short hallway, or be in the dayroom if in the presence of a staff member.

149.    Residents may be placed in the North Unit voluntarily, involuntarily, or for medical reasons. A resident may request placement in the North Unit and clinical

Disability Rights Vermont
141 Main Street / Ste. 7
Montpelier, VT 05602
(802) 229-1355

staff will decide whether to oblige such a request. Residents may be involuntarily placed in the North Unit upon admission to the facility if the sending authority indicates that the child is a risk to the safety of self or others and the Woodside treatment team supports placement in the North Unit. Residents can also be involuntarily placed in the North Unit if they engage in behaviors that jeopardize the safety of residents and/or staff or if there is a reasonable suspicion of an attempted elopement.

150.    On information and belief, the Woodside Director and Assistant Director must be notified of each placement in the North Unit and the Director must approve of each placement in the North Unit.

151.    Despite Woodside policies directing otherwise, children housed in the North Unit often have their privileges and property restricted and often have limited actual access to programs, are deprived of contact with their peers, and are required to eat their meals alone.

152.    Woodside policy dictates that upon entry to the North Unit a treatment plan is to be developed for the child to transition them as quickly as possible back to a more integrated unit.

153.    Defendants have failed, and continue to fail, to create and implement effective transition plans for children placed in North Unit.

154.    Some children are held in the barren, isolating environment of the North Unit for weeks and months at a time despite Defendants being aware that long-term placement in the isolating, dehumanizing environment of North Unit is not therapeutic. JUVENILE 2, for example, was held in the North Unit for five months until he was discharged from Woodside and sent home.

Disability Rights Vermont
141 Main Street / Ste. 7
Montpelier, VT 05602
(802) 229-1355

155.    During a meeting hosted by Defendant Schatz at Woodside on October 31, 2018, children stated to Defendant Schatz that the North Unit should be 'shut down'.

156.    The North Unit is still used to impose unnecessary and harmful seclusion, isolation and deprivation on children with disabilities at Woodside. See case example of Juvenile 8.

### Failing to Admit Children to a Hospital

157.    Defendants fail to employ adequate mental health care staff and resources to meet the needs of the children residents. They fail to provide sufficient emergency mental health treatment for children experiencing acute psychosis, engaging in self-harm, thoughts of suicide and suicidal actions, and other emergencies. They fail to develop adequate treatment plans to meet the actual mental health needs of the children.

158.    Under Vermont law when a person is dangerous to self or others due to mental illness, they are subject to Emergency Examination at a hospital and assessment by a psychiatrist within 24 hours. 18 V.S.A. § 7505.

159.    Children experiencing acute mental health symptoms including self-harming and suicidal ideation typically require around-the-clock acute care by a treating psychiatrist in a hospital.

160.    Instead of taking children at Woodside that are an imminent danger to themselves or others due to their mental illness to a hospital, Defendants have a practice of placing the child in isolation in the North Unit for prolonged periods without an assessment by a medical doctor or psychiatrist or adequate mental health care.

Disability Rights Vermont
141 Main Street / Ste. 7
Montpelier, VT 05602
(802) 229-1355

161.    As an expression of the professional consensus, 42 C.F.R. § 485.910 (e) requires that when seclusion is ordered at a Community Mental Health Center, the patient is to be transferred to a hospital.

162.    Defendants admitted in November 2018 that Woodside was not an appropriate place to house actively suicidal children. Defendants also stated that Woodside accepts all children referred to it even to "Woodside's detriment" due to an acknowledged systemic failure in Vermont's inadequate system of care for adolescents.

163.    Woodside's ability to provide adequate treatment to children with acute mental illness symptoms has decreased since November 2018 rather than improved, including no longer employing a Ph.D. level clinical director on site.

164.    In January 2019, Defendant Schatz wrote a letter to Plaintiff DRVT stating that Woodside would no longer house actively suicidal children and if a child became suicidal, the child would immediately be transported to a hospital.

165.    Defendant Schatz later rescinded the above stated commitment asserting that medical providers assured him that in many circumstances placement in the North Unit is preferable to placement in the local Emergency Department when there is no inpatient bed available to the patient.  See Juvenile 8 supra.

**Grievances and Retaliation**

166.    Woodside has a grievance policy that is supposed to enable the children to voice their concerns and work with staff to ensure that their needs are met and their treatment is therapeutic.

167.    According to the children placed there, staff at Woodside have routinely retaliated against children for filing grievances.

168.     Children at Woodside have reported losing points in the Woodside privilege system specifically in response to filing grievances and that they are told by staff not to discuss grievances amongst themselves.

169.     Defendants are aware of such retaliation, including through the RLSI October 2018 reports and meeting with the residents, and are complicit in it due to failing to implement effective interventions to prevent it.

170.     There are situations in which Defendant Simons is directly involved in uses of force and grievances of the incident are still directed to and decided by him.

171.     Defendants' own internal regulatory staff have stated this aspect of the grievance process is problematic, but Defendants have taken no action to remedy the conflict of interest inherent in Defendant Simons judging the appropriateness of his own actions.

172.     In November 2018, Plaintiff's members at Woodside stated that Woodside employees told the children that they should no longer file grievances because the act of filing a grievance was itself a 'negative behavior'.

173.     Based on reports from Plaintiff's members, staff obstruct their attempts to file grievances by doing such things as not providing them with grievance forms, preventing them from leaving their room to file them, and letting residents know that staff read the grievances and responses if left in the resident's room.

174.     Retaliation against children for utilizing the grievance process creates a sense of fear in many of the children at Woodside that, among other things, reduces their willingness to file grievances and to meet with attorneys and advocates.

**Defendants Schatz and Simons are Personally Involved and have Personal Knowledge of the Unlawful Conditions at Woodside**

175.    All Defendants have knowledge, through children's oral and written reports, grievances, Motions for Protective Orders and related expert testimony, complaints filed by the Office of the Juvenile Defender, RLSI reports, and Plaintiff's communications, about the areas of concern related to this Complaint.

176.    Over the past several years, Defendants Simons and Schatz knew about and failed to assure adequate medical and mental health care for child residents; failed to limit uses of force and isolation to situations requiring such interventions; failed to assure adequate staffing patterns and staff training, including appropriate de-escalation and use of force systems; and failed to house child residents in respectful and dignified circumstances free from fear of retaliation for expressing concerns.

177.    During an October 31, 2018 meeting held at Woodside, all eleven child residents reported to Defendant Schatz that they were afraid of some staff retaliating against them for complaining or disagreeing with policies or practices; that the grievance process was completely dysfunctional; that the North Unit was boring, not therapeutic, and utilized as a punitive device; and that they had witnessed uses of force by staff against child residents that were unnecessary and harmful to all who were aware of it.

178.    Defendants Schatz and Simons have the authority to remove children from the North Unit to avoid harm while placed there; to augment access to services, programs, and activities for children placed in the North Unit; to have children transported to a hospital for medical attention when meeting Emergency Examination

criteria; to prevent retaliation and maintain a functional grievance process; and to prevent unnecessary uses of force and isolation against the children.

179.    Plaintiff DRVT presented Defendants with a draft compliant discussing the same problematic practices asserted herein in December 2018.

180.    In response to that draft complaint, Defendants agreed to regularly meet with DRVT to discuss improving practices at Woodside and to hire a consultant to review the use of force system in place.

181.    Since Plaintiff agreed to refrain from filing the aforementioned Complaint, Defendants have failed to implement effective checks and oversight of uses of force, have failed to adopt or implement a new use of force system, have continued to unnecessarily isolate, seclude, restrain with pain compliance tactics, and failed to provide adequate mental health care to residents sufficient to allow them to benefit from the programs services and activities at Woodside, and has suspended meetings with Plaintiff.

### Plaintiff's Medical Expert Opinions

182.    Plaintiff has obtained a medical opinion from a qualified expert(s) that Defendants' practices regarding inadequate mental health treatment, unnecessary, unsafe and harmful uses of force, and over use of isolation and deprivation are dangerous and harmful to the children at Woodside and are deviations from the standard of care and risk imminent and irreparable harm to the children placed at Woodside.

183.    Plaintiff's experts opine that contributors to the serious imminent risk of children at Woodside include the use of inappropriate staffing patterns, use of inappropriate and dangerous use of force procedures, use of restraint, isolation and

seclusion unnecessarily, lack of adequate mental health treatment to reasonably avoid

uses of force, and lack of adequate supervision and oversight.

184.    Plaintiff's constituents at Woodside, children with disabilities, face

immediate and imminent threats of irreparable harm from Defendants' unlawful

practices, and many children have filed formal grievances only to have the grievances

denied or delayed indefinitely.

**FIRST CAUSE OF ACTION – DEFENDANTS SCHATZ AND SIMONS, IN THEIR OFFICIAL CAPACITIY, VIOLATE PLAINTIFF'S MEMBERS' RIGHT TO FREE SPEECH PROVIDED BY THE FIRST AMENDMENT TO THE UNITED STATES CONSITUTION BY KNOWINGLY MAINTAINING PRACTICES AND POLICIES THAT OBSTRUCT AND CHILL THEIR ABILITY TO UTILIZE THE GRIEVANCE SYSTEM.**

185.    Plaintiff incorporates by reference paragraphs one (1) through one

hundred eighty-four (184), above.

186.    Defendants Schatz and Simons, in their official capacities, acting under

color of law, and through their actions and omissions related to Plaintiff's members'

fear of expressing their concerns while placed at Woodside due to perceived or actual

retaliation and maintaining a dysfunctional grievance system, deprived Plaintiff's

members of their First Amendment Right to free speech.

187.    Plaintiff's members suffered, and continue to suffer, severe harm due to

Defendants' actions and omissions described above.

**SECOND CAUSE OF ACTION – DEFENDANTS SCHATZ AND SIMONS IN THEIR OFFICIAL CAPACITIES VIOLATE PLAINTIFF'S MEMBERS' SUBSTANTIVE DUE PROCESS RIGHTS PROVIDED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION BY ALLOWING PRACTICES AND POLICIES REGARDING USES OF FORCE THAT INCLUDE THE USE OF PAIN COMPLAINCE TECHNIQUES, RIOT GEAR AND UTILIZING FORCE IN UNNECESSARY SITUATIONS.**

188.    Plaintiff incorporates by reference paragraphs one (1) through one

Disability Rights Vermont
141 Main Street / Ste. 7
Montpelier, VT 05602
(802) 229-1355

hundred eighty-four (184) above.

189.    Defendants Schatz and Simons, in their official capacities, acting under color of law, through their actions and omissions related to the afore mentioned policies and practices of allowing unnecessary, excessive, and harmful uses of force to occur through the use of a harmful and dangerous use of force modality that is not appropriate nor nationally accepted, failing to restrict uses of force to emergency situations, and failing to maintain an appropriate staffing pattern to assure resident safety, deprive Plaintiff's members of their substantive due process Fourteenth Amendment Right to be free from punishment.

190.    Plaintiff's members suffered, and continue to suffer, severe physical and psychological harm due to Defendants' actions and omissions described above.

**THIRD CAUSE OF ACTION – DEFENDANTS SCHATZ AND SIMONS IN THEIR OFFICIAL CAPACITES VIOLATE PLAINTIFF'S MEMBERS' SUBSTANTIVE DUE PROCESS RIGHTS PROVIDED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION BY ALLOWING PRACTICES AND POLICIES REGARDING USES OF ISOLATION AND SECLUSION THAT ARE PUNITIVE AND HARMFUL AND UNNECESSARILY DEPRIVE THEM OF FREEDOM OF MOVEMENT.**

191.    Plaintiff incorporates by reference paragraphs one (1) through one hundred eighty-four (184) above.

192.    Defendants Schatz and Simons, in their official capacities, acting under color of law, through their actions and omissions related to the aforementioned practices and policies of allowing unnecessary, excessive, and harmful uses of isolation and seclusion deprive Plaintiff's members of their substantive due process Fourteenth Amendment Rights to be free from unnecessary restrictions on their freedom of movement.

193.     Plaintiff's members suffered, and continue to suffer, severe physical and psychological harm due to Defendants' actions and omissions described above.

### FOURTH CAUSE OF ACTION – DEFENDANTS SCHATZ AND SIMONS IN THEIR OFFICIAL CAPACITIES VIOLATE PLAINTIFF'S MEMBERS' SUBSTANTIVE DUE PROCESS RIGHTS PROVIDED BY THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION BY ALLOWING POLICIES AND PRACTICES REGARDING MEDICAL CARE THAT ARE HARMFUL AND ARE NOT BASED ON PROFESSIONAL JUDGEMENT.

194.     Plaintiff incorporates by reference paragraphs one (1) through one hundred eighty-four (184) above.

195.     Defendants Schatz and Simons, in their official capacities, acting under color of law, through their actions and omissions related to the afore mentioned policies and practices of failing to assure adequate medical and mental health care, including failing to transport to a hospital when a child is an actual danger to self or others due to mental illness; failing to maintain an appropriate staffing pattern to assure resident safety; and failing to ensure that staff are supervising children in seclusion deprive Plaintiff's members of their substantive due process Fourteenth Amendment Right to receive adequate medical and mental health care.

196.     Plaintiff's members suffered, and continue to suffer, severe physical and psychological harm due to Defendants' actions and omissions described above.

### FIFTH CAUSE OF ACTION – DEFENDANT DCF'S PRACTICES AND POLICIES OF ISOLATING AND SECLUDING CHILDREN AT WOODSIDE DEPRIVING THEM OF ACCESS TO PROGRAMS, SERVICES, AND ACTIVITIES OTHERWISE AVAILABLE TO THEM IS IN VIOLATION OF TITLE II OF THE ADA.

197.     Plaintiff incorporates by reference paragraphs one (1) through one hundred eighty-four (184) above.

198.     Defendant DCF/Woodside, through its acts and omissions noted above,

failed to protect children with disabilities placed at Woodside from illegal, disability-

based discrimination in the form of humiliation, isolation, reduction in property and

privileges, and applications of uses of force, including pain compliance, all

unnecessarily and in response to disability-based behaviors.

199.     Plaintiff's members suffered, and continue to suffer, severe physical and

psychological harm due to Defendants' actions and omissions described above.

### SIXTH CAUSE OF ACTION – DEFENDANT DCF'S PRACTICES AND POLICIES OF ISOLATING AND SECLUDING CHILDREN AT WOODSIDE DEPRIVING THEM OF ACCESS TO PROGRAMS, SERVICES, AND ACTIVITIES OTHERWISE AVAILABLE TO THEM IS IN VIOLATION OF SECTON 504 OF THE REHABILITATION ACT.

200.     Plaintiff incorporates by reference paragraphs one (1) through one

hundred eighty-four (184) above.

201.     Defendant DCF/Woodside, through its acts and omissions noted above,

failed to protect children with disabilities placed at Woodside from illegal, disability-

based discrimination in the form of humiliation, isolation, reduction in property and

privileges, and applications of uses of force, including pain compliance, all

unnecessarily and in response to disability-based behaviors.

202.     Plaintiff's members suffered, and continue to suffer, severe physical and

psychological harm due to Defendants' actions and omissions described above.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

203.     Issue a judgment that the actions of Defendants described herein are

unlawful and violate Plaintiffs' members' rights under the Constitution and laws of the

United States;

204. Issue a permanent injunction to require: a) discontinue the use of the current use of force technique and instead utilize a nationally approved use of force system and to do so within 90 days; b) prohibit the use of force without a documented showing of imminent risk of serious harm to self or others; and c) prohibit the use of the North Unit without a clinical necessity for isolation and requiring an order from a treatment provider for such a placement every two hours;

205. Issue a permanent injunction requiring the creation of a policy at Woodside that a child whose condition requires more than eight hours in the North Unit be transferred to an emergency department for evaluation and treatment;

206. Issue a permanent injunction requiring Woodside to provide 24/7 access to mental health clinicians for residents, and face to face access to any resident in isolation or seclusion within one hour or immediately if a crisis/emergency exists.

207. Issue a permanent injunction requiring that a mental health clinician be responsible for determining level of property restriction and restriction of movement for any resident placed in the North Unit or under one to one supervision in any other unit, and that the allocations be reviewed and altered to provide the most access and integration reasonable every four hours.

208. Issue a permanent injunction requiring a staffing pattern at Woodside that will assure that individual staff are not required to respond to child resident's needs for more than an eight hour period, with at least an eight hour rest period before further child resident interactions;

209. Grant Plaintiff reasonable attorney fees and costs pursuant to 42 U.S.C.

Disability Rights Vermont
141 Main Street / Ste. 7
Montpelier, VT 05602
(802) 229-1355

41

§ 1988; 42 U.S.C. § 12133; and

210.   Grant such other relief as the Court considers just and proper.

Dated this _20_ day of June, 2019.

By:

Disability Rights Vermont, Plaintiff
Ed Paquin, Executive Director

STATE OF VERMONT
Washington COUNTY, SS.

At Montpelier, Vermont, this 2 day of June, 2019, Ed Paquin Jr.did personally appear before me and signed the foregoing instrument and acknowledged the same to be her free act and deed.

Before me,
_____, Notary Public
Commission Expires: _1-31-21_

Arthur J. Ruben, Esq.
Counsel for Plaintiff
Disability Rights Vermont
141 Main Street, Suite 7
Montpelier, VT 05602
(802) 229-1355
aj@disabilityrightsvt.org

Zachary Hozid, Esq.
Counsel for Plaintiff
Disability Rights Vermont
141 Main Street, Suite 7
Montpelier, VT 05602
(802) 229-1355
Zachary@disabilityrightsvt.org