U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

U.S. DISTRICT COURT
FOR THE DISTRICT OF VERMONT

2019 JUN 21   PM 12: 42

CLERK

BY _____

DEPUTY CLERK

DISABILITY RIGHTS VERMONT, )
               Plaintiff, )
 )
     v. )
 )
STATE OF VERMONT, )
DEPARTMENT OF CHILDREN )
AND FAMILIES, )
KEN SCHATZ, COMMISSIONER, )
in his official capacity, )
JAY SIMONS, WOODSIDE JUVENILE )
REHABILITATION CENTER )
DIRECTOR, in his official capacity, )
           Defendants )

Docket No 5: 19·cv· 106

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW

NOW COMES Plaintiff Disability Rights Vermont (hereinafter Plaintiff), pursuant to Rule 65 of the Federal Rules of Civil Procedure, and hereby Moves this Court to issue a Preliminary Injunction directing Defendants and their agents at the Woodside Juvenile Rehabilitation Center (hereinafter Woodside) to immediately desist from practices that violate Plaintiff's members Constitutional and Statutory Rights, and specifically to:

Issue an injunction to: a) immediately discontinue the current use of force techniques that result in pain to children and implement a nationally approved use of force system within 60 days; b) prohibit the use of force without a documented showing of imminent risk of serious harm to self or others; c) prohibit the use of the North Unit without a clinical necessity for isolation and requiring an order from a treatment provider for such a placement every two hours; d) require that a child whose condition requires more than eight consecutive hours in the North Unit be transferred to a hospital

Disability Rights Vermont
141 Main Street / Ste. 7
Montpelier, VT 05602
(802) 229-1355

1

emergency department for evaluation and treatment; e) require access to mental health clinicians for residents 24/7, and face to face access to any resident in isolation or seclusion within one hour or immediately if a crisis/emergency exists;  f) require that a mental health clinician be responsible for determining level of property restriction and restriction of movement for any resident placed in the North Unit or under one to one supervision in any other unit and that the allocations be reviewed and altered to provide the most access and integration reasonable every four hours; g) require implementation of a staffing pattern at Woodside that will assure that individual staff are not required to respond to child resident's needs for more than an eight hour period, with at least an eight hour rest period before further child resident interactions.

The grounds for this Motion are set forth in Plaintiff's Verified Complaint (hereinafter "VC") and the following Memorandum of Law.

Plaintiff asserts that waiver of any security or bond required is proper for this matter in that there is no likelihood of harm or monetary loss to the Defendants if injunctive relief were to be granted.

## MEMORANDUM OF LAW

## I. **A PRELIMINARY INJUNCTION IS APPROPRIATE IN THIS MATTER**

Plaintiff moves this Court to issue a Preliminary Injunction in order to prevent Plaintiff's members, children with disabilities placed now or in the future at Woodside, from suffering severe and irreparable harm. "[A] party seeking a preliminary injunction must show that it is likely to suffer possible irreparable injury if the injunction is not granted and 'either (1) a likelihood of success on the merits of its case or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor.'" *Elliott v. U.S. Fish & Wildlife Serv.*,

Disability Rights Vermont
141 Main Street / Ste. 7
Montpelier, VT 05602
(802) 229-1355

2

747 F. Supp. 1094, 1100 (D. Vt. 1990) (quoting *Coca–Cola Co. v. Tropicana Products, Inc.*, 690 F.2d 312, 314–15 (2d Cir. 1982)).

Alleged Constitutional violations generally do not require any additional showing of irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984); *Gour v. Morse*, 652 F. Supp. 1166, 1173 (D. Vt. 1987). When there is a need to show irreparable harm, the harm must be "certain and imminent harm for which a monetary award does not adequately compensate." *Wisdom Imp. Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101, 113 (2d Cir. 2003).

In the instant case, the elements required for the Court to issue injunctive relief are met. As further discussed below, Plaintiff is likely to succeed on the merits. Plaintiff's members are suffering immediate and irreparable harm from Constitutional and statutory violations resulting in physical and psychological harm that cannot not be fully remedied through monetary damages and therefore is an irreparable harm. VC ¶¶ 1, 2.

## II. PLAINTIFF IS LIKELY TO SUCCEED ON THE FIRST AMENDMENT CLAIM BECAUSE DEFENDANTS OPERATE A DYSFUNCTIONAL GRIEVANCE PROCESS AND RETALIATE AGAINST PLAINTIFF'S MEMBERS FOR GRIEVING THEIR HARSH CONDITIONS.

a. Woodside Staff Retaliate Against Plaintiff's Members for Filing Grievances and Otherwise Impede Their Ability to Have Confidence in the Grievance System.

Where a private citizen asserts a First Amendment claim against a public official, the plaintiff must demonstrate that (1) the plaintiff engaged in speech or conduct that the First Amendment protects; (2) the plaintiff's exercise of his First Amendment rights motivated the defendant's actions; and (3) the defendant's actions effectively chilled the plaintiff's exercise of those rights. *Williams v. Town of Greenburgh*, 535 F.3d 71, 76 (2d

Disability Rights Vermont
141 Main Street / Ste. 7
Montpelier, VT 05602
(802) 229-1355

Cir. 2008); *Moran v. City of New Rochelle*, 346 F. Supp. 2d 507, 517 (S.D.N.Y. 2004) (citation omitted).

Filing grievances in a residential treatment facility is speech protected by the First Amendment. *Noble v. Schmitt*, 87 F.3d 157, 162 (6th Cir. 1996) (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)). Prisoners have a well-established First Amendment right to file grievances against the prison and Plaintiff's members' rights should be at least as great. *Gill v. Pidlypchak*, 389 F.3d 379, 384 (2d Cir. 2004); *Bruce v. Ylst*, 351 F.3d 1283, 1288 (9th Cir. 2003); *Maben v. Thelen*, 887 F.3d 252, 264 (6th Cir. 2018), *reh'g denied* (Apr. 19, 2018). Without protection of their ability to file grievances, Plaintiff's members lack a viable mechanism to remedy injustices suffered at Woodside. Therefore, the Plaintiff's members' conduct of filing grievances is protected speech.

Woodside staff retaliate against Plaintiff's members for filing grievances. VC ¶¶ 68,167, 168. Retaliating against Plaintiff's members for filing grievances is a per se First Amendment violation. *Gill v. Mooney*, 824 F.2d 192, 194 (2d Cir. 1987); *See Pratt v. Rowland*, 65 F.3d 802, 806 & n. 4 (9th Cir.1995) (citing cases). Plaintiff's members have experienced retaliation in the form of losing points in Woodside's merit system. VC ¶ 168. Woodside staff have also told Plaintiff's members that filing a grievance is a "negative behavior." VC ¶ 172.

In addition to the retaliation, the grievance process at Woodside is in itself dysfunctional. Plaintiff's members report that staff have denied access to grievance forms and prevented them from submitting grievances. VC ¶¶ 41, 64, 173. Additionally, Defendant Simons processes all grievances, which is problematic when Defendant Simons' actions or supervision are the subjects of the grievance. VC ¶ 170. Even when

Disability Rights Vermont
141 Main Street / Ste. 7
Montpelier, VT 05602
(802) 229-1355

4

grievances are submitted and processed, Residential Licensing and Special Investigations (hereinafter RLSI) identified situations where Defendant Simons responded to grievances by denying facts that were clearly supported by evidence while making false assumptions of his own. VC ¶ 68.

These retaliatory and deterring behaviors on the part of Woodside staff have a chilling effect on Plaintiff's members' exercise of the grievance system. VC at ¶¶ 68, 177. Chilled speech is determined using an objective test assessing whether the conduct "would deter a similarly situated individual of ordinary firmness from exercising... constitutional rights." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003), *superseded by* 320 F.3d 346, 2003 WL 360053 (2d Cir. Feb. 10, 2003); *See also Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004) (holding that only the objective test is required to determine whether conduct was chilling). This objective test is applied regardless of whether a particular plaintiff was actually subjectively deterred. *Id*.

The retaliatory and deterring behaviors by Woodside's staff are objectively chilling because of the vulnerability of the children. The children at Woodside are reliant on staff at Woodside for all of their daily needs. *See* VC ¶¶ 18-26. In addition, there is a drastic power disparity between the children and staff, even more so than in an adult treatment facility because of the vulnerabilities of children. As such, the conduct by Woodside staff related to the grievance system is sufficiently objectively chilling to constitute violations of Plaintiff's members' First Amendment Rights.

b. Individual Defendants Schatz and Simons are Personally Involved in Woodside's Unconstitutional Practices and Policies of Retaliating and Otherwise Deterring Plaintiff's Members From Filing Grievances.

Disability Rights Vermont
141 Main Street / Ste. 7
Montpelier, VT 05602
(802) 229-1355

Claims brought under 42 U.S.C. § 1983 require personal involvement by the defendants. *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006). A supervisory official defendant is personally involved if they directly participate in the infraction, learn of the violation and fail to remedy the wrong, create the policy or custom at issue or allow it to continue, or if they are grossly negligent in managing subordinates who caused the unlawful condition or event. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quotation omitted). In *Comer v. Cisneros*, the Second Circuit held that the commissioner of New York's Division of Housing and Community Renewal could be liable under § 1983 for failing to use his authority to ensure that the plaintiff's rights were not being violated if the evidence established that he knew about the discriminatory practices and had the authority to put an end to it. 37 F.3d 775, 804 (2d Cir. 1994).

In this case, Defendants Schatz and Simons are both personally involved because they are in supervisory roles, know of the violations, and have failed to remedy them even though they have the authority to do so. VC ¶¶ 6-9, 31-35, 42-45, 73-78. RLSI's October, 2018 reports notified Defendants that the grievance system was defective. VC ¶¶ 41, 64, 68, 71. Plaintiff DRVT also notified Defendants of these issues and even sent Defendants a draft Complaint including the First Amendment Claim prior to filing the instant action. VC ¶ 179. To date, the Defendants have failed to effectively remedy these issues with the grievance process.

**III.    PLAINTIFF IS LIKELY TO SUCCEED ON THE FOURTEENTH AMENDMENT CLAIMS BECAUSE STAFF AT WOODSIDE ROUTINELY ENGAGE IN CONSCIOUS SHOCKING CONDUCT AGAINST CHILDREN UNDER THEIR CARE AND DEFENDANTS ARE AWARE OF, COMPLICIT WITH, AND UNWILLING TO HALT THESE SHOCKING PRACTICES AND POLICIES.**

Plaintiff's members are subjected to unnecessary seclusion and isolation, unnecessary and excessive uses of force, and inadequate mental health care at Woodside, all in violation of their Substantive Due Process Rights. Individual Defendants are aware of these ongoing violations and have shown deliberate indifference in failing to take remedial actions.

The Due Process Clause of the Fourteenth Amendment provides a right to personal security, to be free from undue bodily restraints and excessive force, and to receive adequate medical care and treatment and those rights are "not extinguished by lawful confinement." *Youngberg v. Romeo*, 457 U.S. 307, 315–19 (1982) ("If it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed—who may not be punished at all—in unsafe conditions.") (citations omitted). When the State deprives a person's ability to care for himself, the State has an enforceable duty to protect them from harm. *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 198–99, (1989) (citing *Youngberg v. Romeo*, 457 U.S. 307 (1982); *Estelle v. Gamble*, 429 U.S. 97, 97 (1976)). To succeed on a claim of violation of a Substantive Due Process right, a plaintiff must establish that the conditions of confinement 1) were expressly intended to punish; 2) lacked a legitimate purpose, or 3) were either objectively "excessive" or not rationally related to a legitimate purpose. *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2474 (2015); *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979); s*ee Mulvania v. Sheriff of Rock Island Cty.*, 850 F.3d 849, 856-58 (7th Cir. 2017), *cert. denied sub nom.*, 138 S. Ct. 361 (2017) (genuine issues of fact whether policy was "excessive in relation to a [legitimate] purpose"); *Milonas v. Williams*, 691 F.2d 931, 940-43 (10th Cir. 1982).

Disability Rights Vermont
141 Main Street / Ste. 7
Montpelier, VT 05602
(802) 229-1355

7

The defendants' conduct must be conscience-shocking or arbitrary in order to violate Due Process protections. *Little v. City of New York*, 487 F. Supp. 2d 426, 443 (S.D.N.Y. 2007). Reckless or deliberately indifferent acts can shock the conscience when there is time for the actor to deliberate. *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 853 (1998) ("deliberate indifference" is enough to shock the conscience in prisoner misconduct cases, for example, because of "the luxury enjoyed by prison officials of having time to make unhurried judgments, upon the chance for repeated reflection."). A government official's acts or omissions are deliberately indifferent when the official knew or should have known that their acts or omissions would create "an excessive risk to health or safety." *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017). Acts and omissions by government officials that take place "over an extended period of time and in the face of action that presented an obvious risk of severe consequences and extreme danger," tends to shock the conscience. *Pena v. DePrisco*, 432 F.3d 98, 114 (2d Cir. 2005); *see also Okin v. Village of Cornwall-On-Hudson Police Dept.*, 577 F.3d 415, 431-32 (2d Cir. 2009) (finding that an officer's repeated failure to address obvious domestic abuse could indicate deliberate indifference and conscience-shocking behavior).

In this case, all of the allegations of Substantive Due Process violations involve reoccurring acts that the Defendants have known about for over a year and continue to fail to redress. VC ¶¶ 31-35. Because Defendants have had ample opportunity to address these Constitutional violations and have been given options on how to do that, their failures are done with deliberate indifference.

a. The Policies and Practices Regarding the Use of Seclusion and Isolation at Woodside Deprives Plaintiff's Members of Their Right to be Free From Unnecessary Bodily Restraint.

Disability Rights Vermont
141 Main Street / Ste. 7
Montpelier, VT 05602
(802) 229-1355

8

Plaintiff's members are routinely placed in seclusion or isolation without an immediate safety risk requiring such restrictions. VC ¶¶ 56, 57, 61, 67, 85, 90, 98, 107, 116, 154, 156. "[L]iberty from bodily restraint always has been recognized as the core of the liberty protected by the Due Process Clause from arbitrary governmental action." *Youngberg v. Romeo*, 457 U.S. 307, 316 (1982) (quotation omitted). Seclusion or isolation of individuals—a form of bodily restraint—in a treatment facility such as Woodside, is therefore permissible only when necessary to address a legitimate threat to safety. *See Id.* at 320; *Thomas S. by Brooks v. Flaherty*, 699 F.Supp. 1178, 1190 (W.D.N.C.1988), *aff'd, Thomas S. by Brooks v. Flaherty*, 902 F.2d 250 (4th Cir.1990) ("the...constitutional liberty interest in avoiding bodily restraint encompasses... freedom from solitary confinement *except* in emergencies") (emphasis added). Furthermore, the duration of the isolation or seclusion must be limited to what is necessary. *See Youngberg*, 457 U.S., at 322; *Thomas S. by Brooks*, 699 F. Supp., at 1190. Seclusion cannot be used as part of a patient's treatment plan. *Rogers v. Okin*, 478 F. Supp. 1342, 1374-75 (D. Mass. 1979), *reversed on other grounds*, 634 F.2d 650 (1st Cir. 1980), *vacated sub nom. Mills v. Rogers*, 457 U.S. 291, 102 S. Ct. 2442, 73 L. Ed. 2d 16 (1982) (enjoining defendants at a psychiatric hospital from ordering seclusion "except in emergency situations where there is the occurrence or serious threat of extreme violence, personal injury, or attempted suicide.").

Defendants' assertions of imminent safety risk must be supported by evidence. *See Davis v. Hubbard*, 506 F. Supp. 915, 941–42 (N.D. Ohio 1980) (holding that there was a substantive due process violation, in part, because the evidence did not indicate an imminent safety threat requiring seclusion). Indeed, the Court in *Youngberg* articulated

Disability Rights Vermont
141 Main Street / Ste. 7
Montpelier, VT 05602
(802) 229-1355

that professional judgment has constitutional bounds and must be subject to judicial analysis. *West v. Macht*, 235 F. Supp. 2d 966, 982–83 (E.D. Wis. 2002), *aff'd sub nom. West v. Schwebke*, 333 F.3d 745 (7th Cir. 2003) (citing cases since *Youngberg* that stress the need for judicial review).

Several courts have held that locking psychiatric patients in a room without evidence of an imminent safety risk violates the patient's Substantive Due Process Rights. For example, in *Rogers v Okin*, the court held that the plaintiff's Substantive Due Process rights were violated when staff ordered seclusions for non-emergency situations such as when patients were engaging in bizarre or inappropriate but not threatening behavior. 478 F. Supp., at 1373-75 (D. Mass. 1979). The court also held that it was unconstitutional to order seclusion in situations where staff believed that doing so was in the patient's "best interests." *Id*. at 1375.

In *West v. Macht*, the court found that the defendants failed to use professional judgment when they secluded civilly committed plaintiffs as part of their treatment without evidence that there was an emergency requiring such seclusion. *West*, 235 F. Supp. at 981. Like Plaintiff's members here, the plaintiffs in *West* were patients at a treatment center in state custody that were subjected to isolation in a seclusion cell with limited property for extended periods. *Id*. at 968. The court held that seclusion without justification of an imminent safety risk requiring patient isolation was a drastic departure from professional standards. *Id*. at 83-84. Similarly in *Davis*, the court found that the orders of seclusion were arbitrary and in violation of the patient's Substantive Due Process rights in part because the seclusion was ordered to address "restless, noisy, destructive and dirty" patients. *Davis*, 506 F. Supp., at 941–42.

Plaintiff's members are routinely isolated and secluded in Woodside in nonemergency situations and for unnecessarily long durations. VC ¶¶ 56, 154, 156. The North Unit, a small, barren unit with three seclusion cells, a padded room, a dayroom, and a conference room, is used regularly for seclusion and isolation. VC ¶ 145-146. When children are placed in the North Unit, they are isolated from their peers, often kept locked in their cell or occasionally allowed to walk in the short hallway or be in the dayroom if in the presence of a staff member. *Id*. at ¶¶ 147, 148. Children on the North Unit are often secluded in their small cell when there is no imminent safety risk. VC ¶¶ 56, 154, 156. They are also kept in seclusion far beyond the time necessary and appropriate. *Id*.

Woodside policy dictates that children can be involuntarily placed in the North Unit if they are "a risk to the safety of self or others and the Woodside treatment team's supports placement in the North Unit." Woodside Policy 502, https://dcf.vermont.gov/sites/dcf/files/Youth/ws-policies/502.pdf. This policy is arbitrary because it does not require an imminent risk of safety. In Juvenile 2's situation, North Unit placement for over five months was unwarranted as there was no continuing safety risk, and certainly not one lasting such a long time, that could not be addressed through less severe alternatives. VC ¶ 154. Interestingly, this supposedly imminently dangerous child was released to his home upon discharge from Woodside's North Unit. *Id*.

In addition, Woodside policy authorizes the placement in the North Unit if there is a "reasonable suspicion of an attempted elopement." Woodside Policy 502; VC ¶ 149. An elopement is only a safety risk when it is occurring and can be mitigated through one on one staffing or other alternatives. No other treatment facility in Vermont secludes or isolates a patient for planning or attempting an elopement because there are less

11

restrictive alternatives available to prevent elopement. As such, use of the harsh, isolative environment of North Unit in response to a past or non-imminent elopement effort is a violation of Substantive Due Process Rights.

While Woodside policy dictates the development of treatment and transition plans upon entry to the North Unit, this policy is not always effectively implemented. Woodside Policy 502; VC ¶¶ 152-154. For example, no effective treatment plan was developed for Juvenile 2. VC ¶ 154. Similarly, Juvenile 8 has been placed long-term in the North Unit on several occasions without adequate treatment or planning to support her release to less restrictive settings. *Id*. at ¶¶ 105-107. This practice of prolonged isolation and seclusion is harmful to Plaintiff's members. *Id*. at ¶¶ 139-141.

b.  Woodside's Policies and Practices Related to Uses of Force are Objectively Unreasonable Because They Involve the Use of a Dangerous Technique and Often in Unnecessary Situations.

Plaintiff's members have a well-established right to be free from unnecessary uses of force. *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992). The Defendants violate Plaintiff's member's right to freedom from unnecessary force in two ways: 1) using force in unnecessary situations; and 2) applying a use of force/physical restraint modality that is excessively harmful and dangerous. VC ¶¶ 39, 40, 46-48, 56-59, 63, 64, 79-97, 108-134.

In determining whether the force used was objectively unreasonable courts are to consider:

> (1) the need for the application of force, (2) the relationship between the need and the amount of force that was used, (3) the extent of injury inflicted, and (4) whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.

Disability Rights Vermont
141 Main Street / Ste. 7
Montpelier, VT 05602
(802) 229-1355

12

*Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2476 (2015) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973). The Court in *Kingsley* clarified that the fourth element is not necessary for liability and that instead an objective test is to be applied. *Id*. A number of courts, including in this Circuit, have applied the *Kingsley* objective standard analysis for excessive force claims for the civilly committed. *Maxwell v. Miller*, No. 916CV0275LEKDEP, 2018 WL 3095834, at *5 (N.D.N.Y. May 21, 2018), report and recommendation adopted, No. 916CV0275LEKDEP, 2018 WL 3069210 (N.D.N.Y. June 21, 2018) (plaintiff civilly committed to a psychiatric facility); *Carter v. Huterson*, 831 F.3d 1104, 1109 (8th Cir. 2016) (civilly committed sex offender); *Clay v. Emmi*, 797 F.3d 364, 369 (6th Cir. 2015); *Madison v. Scott*, No. 13-3317, 2015 WL 5734874, at *3 (C.D. Ill. Sept. 29, 2015) (civilly committed to detention and treatment center).

Government officers violate children's substantive due process rights when they use force that is unnecessary or excessively harmful. For example, in *West v. Whitehead*, the plaintiff with developmental disabilities residing in a residential facility alleged that staff frequently hit her and threatened her with a hair brush, repeatedly tied a bib between her nose and mouth, and hit her with a clothes hanger. No. 04-cv-9283, 2008 WL 4201130, at *4-7 (S.D.N.Y. Sept. 11, 2008). The court then concluded that any conduct on the part of the defendant that took advantage of the plaintiff's disabilities and inability to defend herself, could be considered conscience shocking by a reasonable juror. *Id*. at *18. Similarly, in *Hartfield v. O'Neill*, the court held that hitting a vulnerable child in a particularly sensitive part of her head shocked the conscience because of the obvious danger to the child. 534 Fed. Appx. 838, 845 (11th Cir. 2013). In so holding, the Court

found that this use of force was unnecessary and therefore served no governmental interest. *Id*. at 845-46.

As in *West* and *Hartfield*, *Supra*, Woodside staff engage in a pattern of violent and aggressive conduct directed at children with disabilities perpetrated with no legitimate governmental interest. *See e.g.* VC ¶ 64 (using force because the child refused to go to her room); *see also Id*. at ¶ 67 (restraining a child for covering his cell window); *Id*. at ¶¶ 39, 40, 46-48, 56-59, 63, 79-97, 108-134. Juvenile # 1 had been isolated and secluded for several days when staff confronted him and exacerbated the situation. VC at ¶ 85. The initial justification for confronting Juvenile # 1 was to ensure that he was safe. *Id*. at ¶ 87. Staff opened the door to his cell and continued to confront him even after confirming that he was safe. *Id*. This led to an incident where Woodside's dangerous use of force modality was used against him unnecessarily. *Id*. at ¶ 86. Dr. Bellonci and Mr. Capcara have identified the unnecessary use of force as a systemic problem at Woodside. Trial Tr. 64-68, 72, 82, April 16, 2019; Trial Tr. 144, 193-195, 198, April 18, 2019; Trial Tr. 55, April 30, 2019.

The use of force modality used at Woodside involves the use of dangerous prone position (lying face down), twisting and hyperextending the child's arms behind their head, while simultaneously twisting and pushing the child's ankles into their back. *Id*. at ¶¶ 120-123. The use of force modality used at Woodside creates unnecessary pain by putting pressure on joints that could cause serious injury and prone positioning creates a risk of asphyxiation and death. *Id*. Woodside is the only treatment facility in Vermont not using a nationally accepted use of force/de-escalation system. *Id*. at ¶ 118. These painful and dangerous techniques were used on Juvenile #1 as well as Juvenile #6, Juvenile #7,

and several of the children identified in the RLSI October 2018 reports. *Id.* at ¶¶ 48, 58, 59, 64, 67, 86, 92-97. Additionally, riot gear, including shields and metal handcuffs are also used at Woodside, but not at any other treatment facility in Vermont. *Id.* at ¶ 124.

Of further concern, this dangerous technique is often sloppily conducted thereby increasing the risk of harm. At Juvenile #1's civil trial, Dr. Bellonci described the use of force against Juvenile #1 as being "ugly" and "hard to watch…looked like [Juvenile #1] was being choked…he sounded like he was being choked…." Trial Tr. 68:18-73:1-7, April 16, 2019. Dr. Bellonci stated his opinion that there is imminent threat of serious injury to children at Woodside from the use of force system. *Id.* at 101:24. Paul Capcara, RN, described his concerns similarly, cautioning that children at Woodside are at risk of imminent serious injury or death because of the use of force system. Trial Tr. 157-160, April 18, 2019; Trial Tr. 66, April 30, 2019.

These patterns of excessive uses of force on children at Woodside puts the children in imminent risk of serious physical or psychological injury and is therefore conscious shocking. VC ¶¶ 84, 121, 123, 182, 183.

c. Defendants Fail to Provide Adequate Mental Health Care to Plaintiff's Members Confined to the North Unit as Evidence by Their Long-Term Confinement There.

"When individuals are placed in custody or under the care of the government, their governmental custodians are sometimes charged with affirmative duties, the non-feasance of which may violate the constitution." *P.C. v. McLaughlin*, 913 F.2d 1033, 1044 (2d Cir. 1990) (quotation omitted). Claims for inadequate medical and mental health care by people civilly committed are analyzed under the same deliberate indifference standard as for pretrial detainees. *See James v. Kaskiw*, No. 9:13-cv-526, 2016 WL 770193, *4 (N.D.N.Y. Jan. 28, 2016) (citation omitted); *see also Ahlers v. Kaskiw*, No.

Disability Rights Vermont
141 Main Street / Ste. 7
Montpelier, VT 05602
(802) 229-1355

9:12–CV–501, 2014 WL 4184752, *5 (N.D.N.Y. Aug. 21, 2014) (collecting cases); *Beck v. Wilson*, 377 F.3d 884, 889 (8th Cir. 2004) ("The Supreme Court explained that 'when the State takes a person into its custody and holds [her] there against [her] will, the Constitution imposes upon it a corresponding duty to assume responsibility for [her] safety and general well-being'") (quoting *DeShaney v. Winnebago Couty Dep't of Soc. Servs.*, 489 U.S. 189, 199-200, (1989)). Medical care includes mental health care. *Langley v. Coughlin*, 888 F.2d 252, 254 (2d Cir. 1989).

Defendants repeatedly fail to transport children to a hospital when the child clearly requires hospital level mental health care. VC ¶¶ 54, 98-104, 157, 160. The Second Circuit has presented "a non-exhaustive list" of factors to consider for whether a medical need is serious: "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) 'the existence of chronic and substantial pain.'" *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003) (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

A person that is an immediate safety risk due to a mental illness to the point of needing to be locked in a room is clearly experiencing a serious medical need. Under Vermont law, when a person poses immediate risk of serious injury to self or others due to mental illness, they are subject to Emergency Examination at a hospital and assessment by both a medical doctor and a psychiatrist. 18 V.S.A. §§ 7504, 7505, 7508. Each year in Vermont, medical professionals involuntarily admit hundreds of people meeting this criterion to Emergency Departments of hospitals and provide needed examination and

Disability Rights Vermont
141 Main Street / Ste. 7
Montpelier, VT 05602
(802) 229-1355

16

treatment. *See* Vermont Department of Mental Health Scorecard, available at https://embed.resultsscorecard.com/Scorecard/Embed/9939.

Children meeting Emergency Examination criteria held at Woodside are routinely placed in the North Unit and/or seclusion for long periods of time instead of being transported to a hospital. VC ¶¶ 54, 98-104, 157, 160. For example, Juveniles #5 and #8 were both held in the North Unit for several days while actively suicidal and self-harming and identified as requiring inpatient mental health treatment. *Id*. at ¶¶ 54, 98-104. While Juvenile #8 was eventually transferred to a hospital Emergency Department, she is now back at Woodside and again confined to the North Unit where she continues to be actively suicidal. *Id*. at ¶¶105-107.

Children in the North Unit are not getting adequate mental health care when they are a risk of harm to self or others. In a hospital emergency department, unlike in the North Unit, a psychiatrist would see the children within 24-hours and the child would have prompt and regular access to a physician. *Id*. at ¶ 159. Woodside does not have a Ph.D.-level clinician directing mental health care at the facility. *Id*. at ¶ 163. The child in the emergency department, unlike the child held at Woodside, would also be protected under federal law from unnecessary seclusion and restraint. *See* 42 C.F.R. § 483.356 (Protection of Residents); *see also* 42 C.F.R. § 483.358 (Orders of the Use of Restraint and Seclusion).

Prolonged periods of seclusion and isolation in the North Unit is also evidence that the treatment provided in the North Unit is inadequate. VC ¶ 107; Trial Tr. 53-56, 59-60 April 16, 2019, 63, April 30, 2019 (describing how the lack of adequate mental health care resulted in acting out behavior). Prolonged time in the North Unit is known to

negatively impact a child's mental health condition. VC ¶¶ 139, 140. Defendants' practice of maintaining actively self-harming or suicidal children in the North Unit is harmful, contrary to standards of care and yet a continued practice by Defendants.

d. Individual Defendants are Personally Involved in Woodside's Substantive Due Process Violations.

Defendants Schatz and Simons are both aware of and personally involved as supervisors in the above described practices and policies that result in Substantive Due Process Violations. VC ¶¶ 6-9, 31-35, 175-180. In fact, Defendants were put on notice of these specific issues first by the Juvenile Defender's Office and then the October 2018 RLSI reports. *Id*. at ¶ 32. Plaintiff DRVT then contacted Defendants in December 2018 and sent them a draft complaint and a demand letter stating how Defendants could avoid litigation. *Id*. at ¶ 179-180.

Defendants admitted that they have accepted children at Woodside that they could not adequately care for because of lack of appropriate and adequate resources. *Id*. at ¶ 162. Defendants Schatz and Simons are therefore personally involved in and deliberately indifferent to the Substantive Due Process violations noted above.

**IV. PLAINTIFF IS LIKELY TO SUCCEED ON THE AMERICANS WITH DISABILITIES ACT AND REHABILITATION ACT CLAIMS BECAUSE DEFENDANT DCF'S PRACTICES AND POLICIES OF NEEDLESSLY ISOLATING AND SECLUDING CHILDREN DUE TO THEIR DISABILITIES DEPRIVES PLAINTIFF'S MEMBERS OF THE FULL BENEFITS OF DEFENDANT'S PROGRAMS, SERVICES, AND ACTIVITIES.**

A prima facie claim under the ADA requires Plaintiff to establish that: (1) Plaintiff's members at Woodside are qualified individuals with a disability; (2) that Woodside is a public entity as defined by the Act; (3) that children at Woodside are denied the opportunity to participate in or fully benefit from Defendants' services, programs, or

activities, or are otherwise discriminated against by Defendants; and (4) that the discrimination is by reason of disability. 42 U.S.C. § 12132; *Wright v. New York State Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016) (citations omitted). The Rehabilitation Act is similar to the ADA and provides that no otherwise qualified individual with a disability shall be "excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). "The phrase 'services, programs, or activities' has been interpreted to be a 'catch-all phrase that prohibits all discrimination by a public entity.'" *Noel v. N.Y.C. Taxi & Limousine Comm'n.*, 687 F.3d 63, 68 (2d Cir. 2012). Disability discrimination under the ADA can take one of three forms: (1) intentional acts of disability based discrimination; (2) denial of reasonable accommodations; or (3) disproportionate impact. *McPherson v. Michigan High Sch. Athletic Ass'n*, 119 F.3d 453, 460 (6th Cir.1997); *see also Forziano v. Indep. Grp. Home Living Program, Inc.*, 613 F. App'x 15, 17-18 (2d Cir. 2015) (differentiating between intentional and unintentional disability discrimination).

Woodside is operated by the Vermont Department of Children and Families (hereinafter DCF) and is therefore a public entity covered by the ADA. 42 U.S.C. § 12131 (1); VC ¶¶ 3, 4. DCF is liable under the Rehabilitation Act because it receives federal funding. VC ¶ 5; 29 U.S.C. § 794(b).

All of Plaintiff's members at Woodside are there because they have mental health or developmental disability-related conditions that impair major life functions and are thus people with disabilities. 42 U.S.C. § 12102, 28 C.F.R. § 35.108(a)(2)(i);  VC ¶¶ 1, 2, 12, 19, 23, 26.  All children at Woodside are qualified individuals with disabilities because they are eligible to receive and benefit from programs, services and activities at

Woodside. 42 U.S.C. § 12131(2).  VC ¶ 27; *See Johnson v. City of Saline*, 151 F.3d 564, 569 (6th Cir. 1998) (determining that "services, programs, and activities include all government activities").

a. By Holding Children With Disabilities in Isolation or Seclusion Due to Their Disability-Related Behaviors, Defendants Prevent Them From Fully Benefiting From Programs, Services, and Activities.

Defendant DCF discriminates against Plaintiff's members when they unnecessarily place them in isolation or seclusion, or use force against them unnecessarily due to their disability-related behaviors and in so doing, deprives them of full benefit of Defendant's programs, services, and activities. *See J.S.X. Through D.S.X. v. Foxhoven*, 361 F. Supp. 3d 822, 836 (S.D. Iowa 2019) (denying defendant's motion for summary judgment when there was a factual dispute as to whether the children were actually deprived access to programs and services). Defendants can only justify depriving children of programs and services while in isolation or seclusion when there is an actual safety risk that cannot be avoided without such deprivations. 28 C.F.R. § 35.130(h). Congress described the isolation and segregation of individuals with disabilities as a serious and pervasive form of discrimination. 42 U.S.C. § 12101(a) (2), (5). Woodside staff routinely isolate and seclude children without a safety risk requiring such drastic action. *Supra*, Section III (a).

When children are in isolation or in the North Unit, they are deprived the full benefits of Woodside's programs, services, and activities otherwise available to children at Woodside. VC ¶¶ 147, 148, 151. Children have repeatedly stated that they have little to nothing to do when they are locked in their rooms or placed in the North Unit. *Id*. at ¶ 155. Indeed, seclusion in the North Unit is often seen as a form of punishment. *Id*.

Disability Rights Vermont
141 Main Street / Ste. 7
Montpelier, VT 05602
(802) 229-1355

The denial of meaningful access to programs, services, and activities due to where individuals with disabilities are housed while in state custody is actionable under the ADA. In *Love*, the plaintiff was unable to participate in programming because it was only offered in a part of the building that he could not access due to his being housed in the infirmary because of his mobility impairments. *Love v. Westville Corr. Ctr.*, 103 F.3d 558, 560 (7th Cir. 1996). Similarly, in *Powell v. Wetzel*, the court held that allegations of an inmate's confinement in restricted housing due to mental health issues, even if for his own "safety," was an actionable ADA claim when that placement resulted in his exclusion from programs, services, and activities. *Powell v. Wetzel*, No. 1:12-CV-2455, 2014 WL 2472048, at *2, 11 (M.D. Pa. Feb. 25, 2014), *report and recommendation adopted in part*, No. 1:12-CV-02455, 2014 WL 2472088 (M.D. Pa. June 3, 2014).

In this case, Woodside staff are placing Plaintiff's members in the North Unit because of disability-related behaviors. VC ¶ 144. Juvenile #5, for example, was held in the North Unit for displaying suicidal tendencies. VC ¶¶ 53-61. Juvenile #2 was isolated in the North Unit for months, due to mental health-related behaviors. *Id*. at 154. And Juvenile #3 was restrained and secluded for non-threatening, disability-related behavior as well. VC ¶¶ 63, 64.

"Conduct resulting from a disability is considered to be part of the disability." *Gambini v. Total Renal Care, Inc.*, 486 F.3d 1087, 1093 (9th Cir.2007) (quotation omitted); *Den Hartog v. Wasatch Acad.*, 129 F.3d 1076, 1087 (10th Cir. 1997) ("[t]o permit employers carte blanche to terminate employees with mental disabilities on the basis of any abnormal behavior would largely nullify the ADA's protection of the

mentally disabled."). Punishing disability-related behaviors when someone is involuntarily in state custody is even more concerning than in the employment context because they are already removed from society and deprived freedoms of movement.

Furthermore, the practice of ordering seclusion or isolation for children that are known for or have a history of more severe mental health symptoms "is either 'arbitrary or capricious-as to imply that it was pretext for some discriminatory motive' or 'discriminatory on its face.'" *Pesce v. Coppinger, et al.*, No. CV 18-11972-DJC, 2018 WL 6171881, at *7 (D. Mass. Nov. 26, 2018) (quoting *Kiman v. New Hampshire Dep't of Corr.*, 451 F.3d 274, 276 (1st Cir. 2006). Discrimination based on the severity of a person's disability is impermissible under the ADA. M*essier v. Southbury Training Sch.*, 562 F. Supp. 2d 294, 322 (D. Conn. 2008) (quoting 28 C.F.R. § 35.130). In *Pesce*, the court granted a preliminary injunction when the prison denied the plaintiff his methadone treatment because the prison failed to conduct an individual assessment of the plaintiff as required under the ADA. *Pesce*, CV 18-11972-DJC, 2018 WL 6171881, at *6-7.

Similarly, each order of seclusion or isolation that lacks specific and legitimate justifications is arbitrary and discriminatory. At Woodside, some children are ordered into seclusion or isolation based on what they might do given their history or known disabilities rather than the actual threat they are presenting in the moment. VC ¶ 144. As in *Pesce*, this lack of individual assessments in the moment, is disability-based discrimination.

The denial of programs, services, and activities by reason of disability is always actionable even when the alleged wrongful activity is related to treatment. *Siskos v.*

*Sec'y, Dep't of Corr.*, No. 4:17-CV-186-Juvenile 2-GRJ, 2018 WL 2452204, at *7 (N.D.

Fla. May 18, 2018), *report and recommendation adopted*, No. 4:17CV186-Juvenile

2/GRJ, 2018 WL 2449205 (N.D. Fla. May 31, 2018) (stating that the ADA creates a

cause of action for prisoners challenging medical treatment when the inadequate

treatment prevents access to services) (citing *Schiavo ex rel. Schindler v. Schiavo*, 403

F.3d 1289, 1294 (11th Cir. 2005). Furthermore, when treatment is a program or service

offered by the public entity, discrimination related to the treatment is actionable under

the ADA. *Pesce*, No. CV 18-11972-DJC, 2018 WL 6171881, at *6. Plaintiffs' members

are qualified individuals with disabilities who are denied the full benefit of programs,

services, and activities when held in isolation or seclusion due to their disability-related

behaviors, making Plaintiff likely to succeed on the ADA and 504 claims. VC ¶¶ 27,

138, 147, 151-154.

b. Defendants Fail to Provide Reasonable Accommodations to Avoid Seclusion and
Isolation or Uses of Force for Known Disability-Related Behaviors.

　　Discrimination under the ADA and Section 504 is different than other civil

rights laws because it requires affirmative governmental actions to prevent

discrimination. John Parry, DISABILITY DISCRIMINATION LAW IN

CORRECTION FACILITIES, 24-SUM Crim. Just. 20, 22 (2009); *see Lee v. State,*

*Dep't of Corr. Servs.*, No. 97 CIV. 7112 (DAB), 1999 WL 673339, at *14 (S.D.N.Y.

Aug. 30, 1999) (listing cases where an ADA or Rehabilitation Act violation was found

due to failing to take affirmative steps to ensure meaningful access to programs,

services, and activities); *Lane*, 541 U.S., at 531 (Congress recognized "that failure to

accommodate persons with disabilities will often have the same practical effect as

outright exclusion" or discrimination); *United States v. Georgia*, 546 U.S. 151, 157

Disability Rights Vermont
141 Main Street / Ste. 7
Montpelier, VT 05602
(802) 229-1355

23

(2006). Reasonable accommodations must be provided to people with disabilities even if the person does not make a request so long as the need for an accommodation is apparent. *Pierce v. District of Columbia*, 128 F.Supp.3d 250, 269 (D.D.C. 2015); *Randolph v. Rodgers*, 170 F.3d 850, 858–59 (8th Cir. 1999); *Robertson v. Las Animas Cty. Sheriff's Dep't*, 500 F.3d 1185, 1197–98 (10th Cir. 2007) ("[A] public entity is on notice that an individual needs an accommodation when it knows that an individual requires one, either because that need is obvious or because the individual requests an accommodation.").

In this case, Woodside staff should be fully aware of the disability-related behaviors of the residents because all of the children are there to receive treatment. VC ¶¶ 23-26. As such, they have a duty under the ADA and Section 504 to provide reasonable modifications to policies and practices to avoid situations where uses of force or secluding children is necessary. Woodside's policies and practices tend to do the opposite. *See supra* section III (a) and (b).

There are several reasonable accommodations available to Woodside staff to avoid uses of force and orders of seclusion or isolation. Woodside should adopt a nationally recognized or peer-reviewed policy and practice of de-escalation such as those used by Vermont psychiatric inpatient units. Furthermore, the requests for relief that Plaintiff makes in this case would also serve as reasonable accommodations. VC ¶¶ 204-208. Failing to modify existing programs in light of the known disabilities of children at Woodside violates the ADA rights of those children. As such, Plaintiff is likely to succeed on its ADA claim.

Disability Rights Vermont
141 Main Street / Ste. 7
Montpelier, VT 05602
(802) 229-1355

## **CONCLUSION**

WHEREFORE, Plaintiff hereby requests that this Honorable Court Grant the instant Motion and relief requested above finding that Plaintiff's members are at risk of immediate and irreparable harm if injunctive relief is not granted, and that Plaintiff has demonstrated a likelihood of success on the merits.

Dated at Montpelier, Vermont this $\leq$/ day of June, 2019.

Arthur J. Ruben, Esq.
Counsel for Plaintiff
Disability Rights Vermont
141 Main Street, Suite 7
Montpelier, VT 05602
(802) 229-1355
aj@disabilityrightsvt.org

Zachary Hozid, Esq.
Counsel for Plaintiff
Disability Rights Vermont
141 Main Street, Suite 7
Montpelier, VT 05602
(802) 229-1355
Zachary@disabilityrightsvt.org