IN THE VERMONT SUPERIOR COURT
WASHINGTON COUNTY CIVIL DIVISION

JUVENILE # 1 (N.B.),           ) Case No.   192-4-19 Wncv
          Plaintiff,            )
                               ) Montpelier, Vermont
-against-                       )
                               ) April 16, 2019
KENNETH SCHATZ,                 ) 9:04 AM
          Defendant.            )
_____  )

TRANSCRIPT OF REQUEST FOR EMERGENCY INJUNCTIVE RELIEF

BEFORE THE HONORABLE MARY MILES TEACHOUT,
SUPERIOR COURT JUDGE

APPEARANCES:

DAWN M. SEIBERT, ESQ.
KERRIE L. JOHNSON, ESQ.
Attorneys for the Plaintiff

DAVID R. MCLEAN, ESQ.
Attorney for the Defendant

ALSO PRESENT:
GEORGE BELCHER, Guardian ad Litem
JAY SIMONS, Woodside Facility Director

Transcription Services:                    eScribers, LLC
                                           7227 N. 16th Street
                                           Suite 207
                                           Phoenix, AZ 85020
                                           (973) 406-2250

PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.

TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.



 1   running into the staff or to the staff, and I don't see those

 2   as proportional.  So standing aside would have been another

 3   option.

 4        Once they chose to engage the restraint, I assume

 5   you're going to start asking me about my concerns about the

 6   restraint itself.

 7        Q.   Just one -- a few questions about the initiation of

 8   the restraint.  Was it your understanding that there was an

 9   order authorizing that restraint?

10        A.   Yes.

11        Q.   When was that order issued?

12        A.   Four-something.  It was, I believe, well a half hour

13   or more before when the restraint actually occurred.

14        Q.   Okay, thank you.  Actually, let's move to the next

15   segment, which is when they engage in the restraint on

16   juvenile number 1.  What did you see during that segment that

17   gave you cause for concern?

18        A.   It was ugly.  It used a methodology, a physical

19   methodology, that I have never seen used with any population,

20   certainly no child or adolescent population.

21        Again, it was a difficult situation because of where

22   they were, which might have again played into the calculus on

23   whether or not to initiate a restraint at that point.  Again

24   using a risk-reduction model, there are no good alternatives

25   in that circumstance, but there were probably other

1  alternatives that might have been safer.

2         The things that stand out about the actual restraint

3  was the -- the -- the practice at Woodside, as I understand

4  it, to turn the arm of the individual being restrained up and

5  back.  And I have a yoga practice, and this is not an easy

6  position to -- it defies the typical range of motion

7  associated with the shoulder, and --

8         Q.   Is there a term for that?

9         A.   Hyperextension.

10        Q.   Okay, go ahead, continue to describe your concerns.

11        A.   So they have juvenile 1 with one arm in this position

12  with pressure being applied upwards.  I think because

13  typically, as I understand it, Woodside would have the other

14  arm in the same situation, and you see that later when they

15  move to the soothing room and they have both arms in that

16  position.  I think --

17        Q.   Can I just interrupt you, Dr. Bellonci?  We need a

18  record -- a --

19        A.   A physical description of --

20        Q.   Yes.

21        A.   -- what I'm doing with my body?

22        Q.   So your description is wonderful for the folks in the

23  courtroom, but can you -- when you -- can you describe

24  hyperextension and indicate when you're exhibiting that, what

25  is it you're doing with your words?

1    A.   I will -- I will do my best to describe what I'm
2  gesticulating.  So it's a grabbing of the arm and twisting it
3  behind and above the individual's back with a staff person
4  typically on either arm -- I think because of the location on
5  the bed, the other arm was not put into that position but was
6  instead just folded behind juvenile 1.

7         And then another practice which I have seen only at
8  Woodside is grabbing the legs, crossing them, and then
9  applying pressure of the legs against the body.  Again, not an
10  ideal situation, but the staff person then had both -- had
11  climbed up onto the bed and was using his knee against
12  juvenile 1's neck.  You never want to apply any pressure on
13  the neck or the back because the deaths that occur in
14  restraints are a direct result of asphyxiation.

15        When we met with juvenile 1 yesterday, he said he
16  could not breathe, and you could see in the video tape that he
17  stops speaking, and nobody addressed that, which was
18  concerning, because he was pretty verbal up until that point.
19  His face was turned away, so were he to become cyanotic,
20  meaning that he was dying, he was turning blue; nobody could
21  have seen his face.

22        The staff person that had -- the larger guy who was
23  at the door, was busy clearing out the room.  Nobody was
24  observing his face for any sign of anoxia.  You can hear that
25  when they do decide to move him, he starts coughing, and he

1  says I couldn't speak because I couldn't breathe.  And there

2  doesn't seem to be any immediate concern about that by staff

3  and that wasn't even addressed in kind of when they were

4  talking about what happened and were there any injuries.

5  That's concerning to me, because it happens again when they

6  move him to the soothing room.

7       Q.   So from a medical standpoint, what is a common

8  measure with which you are familiar to address this issue of

9  possible inability to breathe during prone restraints?

10      A.   There is some agencies that use a device called a

11 pulse oximeter, which is a medical device that you can put on

12 the finger and it reads what, in real-time, the blood

13 oxygenation is.  But a low-tech method is just to ensure that

14 somebody's observing the face because it's usually the lips

15 that turn blue first.

16      Q.   Okay, and what is the role of a -- in your

17 experience, what is the role of a clinician during a

18 restraint?

19      A.   Not to be directly involved in the restraint.  I'd

20 say once the restraint is initiated, it's probably too late

21 for the clinician to have a role.

22      Q.   Okay.  Could the clinician be a person who was

23 observing for breathing?

24      A.   Yes.

25      Q.   Okay.  All right, so on the bed, how many arms were

1  in hyperextension at that point?

2      A.   I believe it was just the right arm.

3      Q.   Okay.  And would you describe what they were doing

4  with his legs as hyperextension at that point or how would you

5  describe that?

6      A.   I'm not sure I would call it hyperextension, but it

7  looked very painful.  And again, I've never seen that

8  particular approach to restraining legs, so they were crossed

9  and then they were bent backwards to the point where his heels

10  were making contact with his butt.

11      Q.   Okay.  So let's move to the next segment that you saw

12  on the video which is when they escort him from the room that

13  he was in to the seclusion room.

14      A.   Right.

15      Q.   The question is, did you see -- did anything that you

16  saw during that segment of the video concern you, and why?

17      A.   Yes.  Escorts are another big area of concern.  It's

18  the most risky for staff to sustain injuries, and you could

19  see why in that video.  It's very difficult to move someone

20  who is agitated.  And they made the decision that, for

21  whatever reason, they wanted to move him into that isolation

22  room.  The room he was in was already being used in isolation,

23  from my perspective, because it was locked.  So they had

24  already cleared out, so I don't know what the immediate threat

25  was to warrant the risk associated with an escort.

1          The escort itself was really hard to watch.  The --

2     they have a method where they have an arm secured, and then

3     they grab each other's arm underneath his chest.  But in this

4     case, it appeared that their arms had slipped up to his neck,

5     and particularly where they were trying to squeeze through the

6     narrow doorway, it looked like he was being choked, and he was

7     making sounds that sounded like he was being choked.

8          They then escort him the rest of the way through the

9     hall and move him into the room, and you can hear when they

10    put him down onto the floor.  It sounds like he's gasping for

11    breath, having been choked, and he's coughing at that point.

12        Q.   Okay, so let's move to the events in the seclusion

13    room.

14        A.   Okay.

15        Q.   Similar question.  What did you see -- did you see

16    things that caused concern, and what were your concerns?

17        A.   At that point, the restraint appeared similar to what

18    I had seen in other complaints -- very, very consistent.  That

19    what we saw, I think, at that point was a -- representative of

20    the restraint method used at Woodside.  So again, both arms --

21    I'll describe it rather than show it.  Both arms in this

22    movement bent over, you know, being pulled back assertively by

23    the staff, being held up in hyperextension.  A staff person on

24    his legs, with the legs crossed with pressure being applied,

25    folding those legs, the crossed legs, back to the point where

1  way so that they can see that there is a way out for them, and
2  that by ultimately complying with the expectations, better
3  things will happen for them.

4       And one of the concerns is that he's not feeling like
5  the rewards are close enough in proximity to the behavior that
6  he's supposed to display.  And that's problematic because
7  he'll feel like he has done what was asked of him, and he
8  articulated this with us yesterday.  But the reward is too
9  distant.

10      So for instance, he said that he was complying with
11  taking his medication and he feels like that's been helping.
12  And he's shown other positive indicators of compliance, and so
13  he was going to earn the ability to go to class outside of the
14  North Unit, which is largely self-contained, but it was going
15  to be the next day.

16      And if indeed, he is as developmentally delayed as
17  suggested, you can't have it be that far.  If you think about
18  a seven or eight-year-old, it's not enough to say you're going
19  to get your reward tomorrow.  You've got to have it much more
20  proximal to whatever it is that you're asking of him.

21      Q.  So I just want to end with a final question regarding
22  the risk to juveniles at Woodside should these practices not
23  be enjoined; can you speak to that generally?

24      A.  I worry for his immediate safety and I worry about
25  his long-term -- the long-term impacts of this experience.