UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COUR
DISTRICT OF VERMON
FILED

2019 AUG -9  AM 9: 5

CLERK
BY  *Uhw*
DEPUTY CLERK

DISABILITY RIGHTS VERMONT,          )
                                    )
        Plaintiff,                  )
                                    )
        v.                          )        Case No. 5:19-cv-106
                                    )
STATE OF VERMONT; DEPARTMENT        )
OF CHILDREN AND FAMILIES; KEN       )
SCHATZ, COMMISSIONER, in his official )
capacity; and JAY SIMONS, WOODSIDE  )
JUVENILE REHABILITATION CENTER      )
DIRECTOR, in his official capacity,  )
                                    )
        Defendants.                 )

**ORDER ON MOTION FOR PRELIMINARY INJUNCTION**
**(Doc. 2)**

Plaintiff Disability Rights Vermont has filed a complaint on behalf of youth with

disabilities admitted to Woodside Juvenile Rehabilitation Center ("Woodside"), alleging that

certain policies and practices at Woodside violate the First and Fourteenth Amendments of the

Constitution, the Americans with Disabilities Act, and the Rehabilitation Act. (Doc. 1.)

Currently pending before the court is Plaintiff's motion for a preliminary injunction

directing Defendants and their agents at Woodside to immediately discontinue the allegedly

unconstitutional and unlawful practices. (Doc. 2.) The court conducted a hearing on July 22,

2019, at which time the motion was taken under advisement. (Doc. 30.)

**Background**

**I.      History of Woodside**

Woodside opened in 1986 in the wake of a horrific rape and murder in Essex Junction,

Vermont. It functioned originally as a detention center for juveniles accused of delinquency or

1

adult crimes.  It replaced the Waterbury Juvenile Detention Center in Waterbury, Vermont.

Michael J. Dale, *Lawsuits and Public Policy: The Role of Litigation in Correcting Conditions in*

*Juvenile Detention Centers*, 32 U. S.F. L. Rev. 675, 693–94 (1998).  It has a maximum capacity

of 30 occupants.  Since its opening, Woodside has been operated by Vermont's child welfare

agency, the Department of Children and Families, or its predecessor agencies.

In 2011 the Vermont legislature amended the statute authorizing Woodside to change its

purpose to providing residential treatment for juvenile offenders.  Woodside's current mission is

stated at 33 V.S.A. § 5801(a):

> The Woodside Juvenile Rehabilitation Center in the town of Essex shall be operated
> by the Department for Children and Families as a residential treatment facility that
> provides in-patient psychiatric, mental health, and substance abuse services in a
> secure setting for adolescents who have been adjudicated or charged with a
> delinquency or criminal act.

Woodside remains Vermont's only locked juvenile facility (excluding hospitals which may

provide involuntary treatment.)  It serves youth between 10 and 17 years old, both male and

female.  In recent years occupancy has dropped to 6 to 12 youths, principally boys.  Sixty-five

staff members are employed at Woodside.

Placement is limited to youths under 18 years old.  Woodside serves both a public safety

and a treatment purpose.  The public safety purpose is expressed through the requirement that all

residents be charged or adjudicated as delinquents or minors charged with crimes.  The treatment

purpose is expressed through its description as a treatment facility providing mental health

services.

## II.    Current Operations

In appearance and design, Woodside resembles a small prison.  It is fenced and one

enters through a sally port.  There are two primary residential areas with individual bedrooms

opening into a common room.  Bathrooms are shared.  The additional "North Unit" consists of

2

three individual cells with toilets.  Woodside functions as a school with classes throughout the week.

Woodside is operated by youth counselors who are primarily male.  They work three-day continuous shifts, including rest periods, with four days off.  They dress casually.  Turnover is low.  Many counselors are well into their middle years and older.  The court recognizes the difficulty of their work in seeking to improve the behavior and direction in life of some our most troubled young people.

## III.    Plaintiff's Claims

Three aspects of life at Woodside have given rise to this lawsuit.  One is the practice of restraining youth through a technique developed by Woodside Director Jay Simons called "Dangerous Behavior Control Techniques." (Hr'g Ex. B.)  This system of physical restraint directs staff in how to impose physical control on a recalcitrant youth.  The handbook provided to the court displays a variety of ways to block, parry, and takedown a youth.  It includes advice on handcuffing, team restraint, and room extrication.  It includes a warning about the dangers of positional asphyxia.  It is strongly directed towards physical confrontation and use of force.

The various maneuvers described in Exhibit B culminate in forcing the youth to the floor. While he or she is held face down by staff members, one staff member seeks to cross his or her legs at the ankles and force the legs back up into the buttocks.  At the same time, other staff members pull on both arms in an effort to raise them towards the ceiling at right angles from the body.  In the examples shown to the court, four large male staff members struggled for many minutes to achieve this positioning.  The end result is that the wrists are hand-cuffed and the youth raised to his feet and led to a bedroom to be locked in.

3

The defendant has already conceded that the "Dangerous Behavior Control Techniques" will be replaced within five months by a nationally recognized restraint technique. The parties agree that the new technique is a safe and acceptable substitute. They disagree only about how fast the new policy can be implemented.

The second principal issue in this case is the use of seclusion. Some residents of Woodside are locked in individual rooms for days and weeks on end. Depending on the initial assessment of behavior and needs, a youth may be placed in seclusion immediately upon arrival at Woodside. Others get there due to behavior at Woodside. A youth in seclusion is assigned a youth counselor who is present in his or her room or in the hallway outside for days on end. Plaintiff's experts were very credible in describing the harm caused by prolonged isolation of young people from their peers and normal activities of life.

The final issue concerns the treatment of seriously mentally ill youth. The most troubling piece of evidence placed before the court was a video of a suicidal young woman, naked and streaked with feces, alternatively laughing and glowering at the staff members, both male and female, who were supervising her confinement in a tiled shower room. The court is conscious that the video was a short excerpt from a much longer episode which included a dispute with the University of Vermont ("UVM") Medical Center over whether the young woman belonged at the emergency department (Woodside's perspective) or at Woodside. The stand-off concluded with an incident in which the young woman tore apart the inside of a van while waiting outside Woodside for a decision to be made about her fate. Ultimately, neither institution accepted her and she was released to the home of her grandmother, apparently without further incident.

4

## IV.    Testimony at the Preliminary Injunction Hearing

The testimony of the two sides differed greatly.  Plaintiff called Christopher Bellonci,

M.D., a child psychiatrist.  Plaintiff also called Paul Capcara, R.N., MPH, a nurse with

experience in caring for mentally ill patients in an in-patient setting.  Dr. Bellonci and Mr.

Capcara were sharply critical of Woodside.  They testified that the culture and practice at

Woodside failed to meet modern standards of care which value verbal persuasion and patience

over confrontational techniques.  They also disagreed strongly with the practice of isolating

young people from their peers for days and weeks on end.  In their view, disruptive behavior and

violence were best met with a brief time-out and a return to normal, shared life as quickly as

possible.

In response, Director Jay Simons described the dedication of Woodside staff to their

therapeutic mission.  He defended the restraint technique as non-harmful and noted that no youth

had ever required medical care following an episode of restraint.  He described the success in

school achieved by many residents, often for the first time.  He defended the seclusion practices

as a way of delivering intensive one-on-one services to a resident who was unable to function in

the larger community.  He stressed that most youth sent to Woodside stabilize quickly without

seclusion and either are released to a highly structured school, such as the Beckett or Depot

Street institutions, or return home.  He expressed frustration that UVM Medical Center has

declined to accept Woodside youth who are experiencing mental health crises.

## V.  Existing Woodside Policies

Woodside has a policy in place concerning seclusion entitled "Woodside Policy and

Procedure 502" which outlines the use of and guide for best practices for North Unit referral,

placement, programming, treatment and transition.  (Doc. 33-5.)  On its face, the policy provides

for "the highest level of individualized care and treatment planning with the most amount of programming in a low stimulation environment." (*Id.* at 3.) Policy 502 makes the North Unit sound like a superior version of the East and West Units, the two more conventional residential areas. "Residents in the North Unit will have the same quality of care as the East and West Units including recreation, visitation, education, meals, treatment, or medical care whenever these activities are safely tolerated." (*Id.*) The policy provides for including a resident in "any/all elements of the East/West Unit milieu as the resident can safely tolerate without causing harm to themselves or other residents." (*Id.*)

The evidence at the hearing was less positive. The reports from Department of Children and Families ("DCF") investigators discussed below describe the isolation of youth in the North Unit for extended periods of time. Toilets (which are flushed from outside the rooms) went unattended. Youth went without exercise, bedding, and showers for days. (Doc. 23-2 at 3.) Based on this evidence, it is not credible that the isolation rooms in the North Unit provide a richer, more individualized form of treatment than the East and West Units.

Policy 502 places complete discretion with Woodside staff concerning all aspects of the seclusion practices. The sampling of incidents and violations provided to the court at the preliminary hearing suggest that this discretion is not exercised wisely in all cases and that mistakes and abuses occur with enough frequency to generate five largely negative reports by the DCF regulators in a six-month period in the first half of 2018. Any new policy must limit discretion so that practices such as confining a youth for weeks or months do not occur at all.

Woodside Policy 509 concerns restraint and seclusion. (Doc. 33-6.) As in the case of Policy 502, it places discretion in the hands of the Woodside staff. On its face, the policy sounds reasonable. The policy is not consistent, however, with the use of restraints which the court

6

observed in the videotapes.  Those episodes were chaotic, prolonged and featured considerable violence.  Since DCF has already agreed to the replacement of the restraint program with a nationally recognized program, the court is optimistic that both sides are already committed to a significant reduction in the frequency and intensity of physical conflict with residents.

## VI.  Regulatory and Accreditation Reviews

Woodside has come under outside scrutiny in the last two years.  The Residential Licensing & Special Investigations ("RLSI")  unit of DCF has conducted a series of investigations of individual incidents.  (Hr'g Ex. 2.)  These investigations concluded with findings of numerous violations concerning excessive use of seclusion, use of pain compliance techniques, privacy violations, and excessive force.  (*Id.*)  These findings were tied to specific incidents and were fully supported by interviews with staff and residents.

The RLSI reports submitted to the court concern the period of December 2017–July 2018.  The investigations originated from reports of potential violations from attorneys with the Vermont Office of the Juvenile Defender and in one instance from a mental health screener who was concerned that a youth exhibiting suicidal symptoms was not taken to the hospital.  The reports evaluate Woodside's compliance with the Residential Treatment Program regulations promulgated by DCF.

The RLSI investigators consistently criticized Woodside staff for the following regulatory violations:

- Excessive use of seclusion in the North Unit, primarily through locking youth in their rooms with a low level of interaction with staff.  The isolation is compounded by the removal of belongings and bedding from the rooms in some cases as well as delays in the flushing of toilets and access to fresh water.

7

- Limited use of de-escalation techniques to avoid physical conflict.  Woodside staff were found to trigger violent confrontations by aggressively surrounding and confining youth.

- Pain inducement to obtain compliance.

- Use of restraint to punish the destruction of property.

- Use of a restraint procedure that is not nationally recognized.

- Unreasonable withholding of tampons from a resident.

- Inadequate medical response to a suicide attempt.

- Violation of safety and privacy by removing clothing from a youth.

Not all complaints were substantiated by the RLSI regulators.  The detailed reports recognize the intense and fluid demands of supervising young people who may be violent, rebellious, and in some cases severely disturbed.  But the account developed through the six investigation reports admitted into evidence describe an institution in need of systemic change and reform.

In addition to the work of its own investigators, DCF brought in consultants from the Council of Juvenile Correctional Administrators ("CJCA") to perform an evaluation.  The CJCA report issued on July 11, 2019.  In addition, investigators from DCF conducted a series of site visits, culminating in a favorable report letter in July 2017.  (Doc. 33-2.)  CARF International, a private accreditation firm, issued a favorable report in September 2018.  (Doc. 33-3.)  These broad evaluations were generally very favorable to Woodside.

**VII.  The Four Video Incidents**

Plaintiff has admitted video of four incidents involving the use of force.  These appear on Exhibit 3.  Three involve the restraint of young men.  The fourth

8

concerns Juvenile 8, a severely disturbed young woman, who was confined naked in an empty tiled cell.

### A.    DRVT J 70001 ("red shirt youth")

This video has no audio.  It shows four male staff members surrounding a teenager approximately 16-17 years old.  He is wearing a red shirt.  He is leaning forward on a table looking down while a staff member speaks to him.  He straightens up.  The staff member is speaking emphatically and pointing his finger.  The boy makes a small motion towards the staff member.  The staff member responds by pushing forward against the boy.  He is joined by the other three men who push the boy to the ground.

Once on the ground, the four men struggle ineffectually to subdue the teenager.  One loses his shoe.  The boy's arms are pulled back in a painful manner.  A fifth staff member joins in.  The struggling resumes after a short break.  The five men are unable to control the teenager.  They succeed in handcuffing him with difficulty.  He is carried bodily out of the common room.

### B.    DRVT J 60025 and DRVT J 60056 ("messy room")

There are two videos of this prolonged incident.  J 60056 is an overhead fixed video. J 60025 is a hand-held cell phone video.

This incident begins with a conversation between a staff member in his 50s and a slightly built youth about 14 years old.  They are joined by a younger male staff member.  The boy is initially calm but plainly not in an agreeable mood.  He and the two staff members are alone in the common room.  Over the course of almost 30 minutes, the boy wanders about the common room, growing increasingly restless.  He changes from slippers into sneakers and knocks at the door to the corridor to leave.  No one comes.  He kicks the door repeatedly with the heel of his foot.  The two staff members speak to him intermittently.  They move in and out of the common

9

room, frequently pausing in the glassed-in staff office. The boy starts to make trouble by tipping over the plastic chairs arranged in the common room. He pulls privacy blinds off cell doors and moves them to other cells. He starts to tear up paper and throw it on the floor. This conduct is ignored by the two staff members, who are visible in the staff office. The boy becomes increasingly agitated and throws more and more paper on the floor. The common room is visibly messy. He slides papers under cell doors. When a staff member enters from the corridor, he tries to escape.

At this point the three male staff members try to speak with him. A staff member follows him as the boy walks quickly around the room. Then all four circle him and close in. On a signal, they push him to the floor. They pull his arms back and push down on his body. There is a delay in finding handcuffs. The boy is ultimately handcuffed, subdued, and led into his cell, from which all contents including bedding and the mattress have been removed. He is locked in.

## C.     DRVT J 60055 ("swearing boy")

In this cellphone video with sound, three male staff members are holding a teenager down on the floor. The boy is 15–16 years old. He is extremely upset and profane. At first he is held facedown with his arms and legs on the floor. After a brief period, the three staff members force him into the position taught at Woodside, with his arms pulled high above his back, his legs crossed, and his feet pushed against his backside. The position is obviously painful. The staff members have a great deal of difficulty getting and keeping him in this position. They struggle for about five minutes to keep him in this position before handcuffs are applied. The boy is walked to a cell. The staff members fumble with the handcuffs and unlock them with difficulty. They release the boy on a signal and rush from the cell.

10

### D.     Exhibit 3 ("Juvenile 8")

This video was shot from the corridor outside a cell. It shows a horrific incident involving a teenage girl about 16 years old. The girl is completely naked.[1] The girl is streaked with excrement. She is agitated and has moments of angry accusation followed by wild laughter. She is obviously in the midst of an acute mental crisis. In the course of the video, she is moved a few feet from a cell or anteroom into a white tiled space. The staff who move her are dressed in "haz-mat" suits and hoods. They are all men except for a woman who can be heard in the background. They push a concave plastic shield against the girl's body and push her from the anteroom into the tiled space where the door is locked. A female staff member can then be heard talking to the girl, who is occupied in pushing a wire into her right forearm. The girl is asked why she is doing that. No one interrupts this action on the video. The treatment of this girl is entirely inappropriate and demonstrates in the space of a few minutes Woodside's limited ability to care for a child who is experiencing symptoms of serious mental illness.

### Analysis

Plaintiff has moved for a preliminary injunction pursuant to Fed. R. Civ. P. 65. To obtain a preliminary injunction, Plaintiff must show "(a) irreparable harm and (b) either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting preliminary relief." *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master*

---

[1] From testimony at the hearing, it is known that Woodside staff removed her clothing because she was using strips of cloth to attempt to strangle herself.

*Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) (quoting *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979)).

Before considering whether both elements of the test are present, the court turns to the issue of the scope and nature of the inquiry permitted by the Constitution. The court does not sit as a super accreditation agency or regulator setting policy for DCF and Woodside. Its role is narrow. "A federal court, of course, must identify a constitutional predicate for the imposition of any affirmative duty on a State." *Youngberg v. Romeo*, 457 U.S. 307, 319 n.25 (1982). Here, Plaintiff has alleged a violation of substantive due process arising from the treatment of juveniles detained within Woodside. The court therefore begins its analysis of the criteria for issuing a preliminary injunction—particularly the issue of likelihood of success on the merits—by reviewing the constitutional standards for locked treatment facilities.

In *Youngberg v. Romeo*, 457 U.S. 307 (1982), the Supreme Court upheld a claim that substantive due process applied to three aspects of the treatment of disabled people confined to a state institution. *See also Jackson v. Indiana*, 406 U.S. 715 (1972). Specifically, the Court recognized constitutional liberty interests in safe conditions, freedom from bodily restraint, and training. The Court added these rights to the existing rights to adequate food, shelter, clothing and medical care. *Id.* at 315. Because Vermont has confined the residents of Woodside and removed whatever ability they had to act on their own behalf, the Constitution requires that the state meet the basic needs of safety, treatment, and care. *See Langley v. Coughlin*, 715 F. Supp. 522, 539 (S.D.N.Y. 1989) ("In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause . . . .").

12

The majority decision in *Youngberg* cautions that the interests in safety and freedom "are not absolute; indeed to some extent they are in conflict. In operating an institution . . . there are occasions in which it is necessary for the State to restrain the movement of residents—for example, to protect them as well as others from violence." *Id.* at 320. The Court explicitly recognized the need to balance "the legitimate interests of the State and the rights of the involuntarily committed to reasonable conditions of safety and freedom from unreasonable restraints." *Id.* at 321. This balance rests on an inquiry into whether the executive agency charged with the care of a confined person exercised professional judgment and chose from among professionally acceptable choices in establishing practices within the institutional setting. *Id.*

*Youngberg* is instructive in this case in two ways. It recognizes a constitutionally protected right to appropriate treatment, including training, for persons confined to institutions through civil orders. *See DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989)("[W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set . . . the Due Process Clause.") This principle applies to juveniles as well as adults. *Santana v. Collazo*, 714 F.2d 1172, 1179 (1st Cir. 1983) ("juveniles . . . who have not been convicted of crimes, have a due process interest in freedom from unnecessary bodily restraint which entitles them to closer scrutiny of their conditions of confinement than that accorded convicted criminals.").

The decision also recognizes the deference due to the state's care providers. A decision, "if made by a professional, is presumptively valid . . . [unless] the decision by the professional is

such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Youngberg*, 457 U.S. at 323. The requirement of deference to executive branch expertise has led to criticism. "Since the *Youngberg* decision, some courts have been missing the mark as to what circumstances require court intervention to hold these medical and clinical professionals liable for their actions (and often, inaction.)" Jeremy Y. Weltman, et al., *Deference ≠ Abdication: Application of Youngberg to Prolonged Seclusion and Restraint of the Mentally Ill*, 26 Stan. L. & Pol'y Rev. 239, 242 (2015). Deference remains the law, however, and the court is keenly aware of the need to tread carefully in judging the decisions of professionals who must respond in the moment to difficult situations.

The court declines to impose the alternative test of whether executive action "shocks the conscience." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). This is not a case involving the exercise of individual judgment by an officer under the pressure of an emergency. Nor is it a case in which the plaintiff seeks money damages. Plaintiff complains about policy decisions made over time by administrators with an opportunity for deliberation. Plaintiff seeks a change in those decisions by means of an injunction. As the Supreme Court recognized in *Lewis*, the deliberate indifference standard applicable to prison administrators "is sensibly employed only when actual deliberation is practical and in the custodial situation of a prison, forethought about an inmate's welfare is not only feasible but obligatory under a regime that incapacitates a prisoner to exercise ordinary responsibility for his welfare." *Id.* at 851. In that context, the two standards are effectively the same. Where they differ is in cases of individual judgment by state officials in emergencies. *Id.* at 851 ("[T]he markedly different circumstances of normal pretrial custody and high-speed law enforcement chases show[] why the deliberate

14

indifference that shocks in the one case is less egregious in the other (even assuming that it makes sense to speak of indifference as deliberate in the case of sudden pursuit).").

Woodside is not a prison and the "deliberate indifference" standard is not directly applicable, but the Supreme Court's recognition of a standard of review that is more favorable to plaintiffs in non-emergent settings is instructive. The court uses the *Youngberg* standard rather than the *Lewis* standard because the issue before the court concerns executive policy and change through injunctive relief, not compensation for a single event. That the court's judgment is informed by evidence of particular episodes does not alter its focus on alleged systemic shortcomings in the restraint and seclusion policies.

The court turns now to the criteria that govern the motion for preliminary injunction.

## I.    Irreparable Harm

"Where plaintiffs allege deprivation of a constitutional right, no showing of irreparable harm is necessary." *G.B. by & through T.B. v. Carrion*, No. 09 Civ. 10582 (PAC) (FM), 2012 WL 13071817, at \*14 (S.D.N.Y. Jan. 19, 2012), *aff'd sub nom. G.B. ex rel. T.B. v. Carrion*, 486 F. App'x 886 (2d Cir. 2012) (citing *Lynch v. City of New York*, 589 F.3d 94, 99 (2d Cir. 2009)). Because Plaintiff alleges that Defendants violated the substantive due process rights of the youth admitted to Woodside, the court finds that irreparable harm is established. The court is satisfied that the emotional harm alleged is irreparable both in the sense that it is not readily compensated by money damages, and that the harm caused by the misuse of force resolves slowly and not always fully. The parties agree that youth admitted to Woodside have frequently been subjected to prior abuse and that they are particularly vulnerable to mistreatment. The violence depicted on the video exhibit is intense and long in duration. Similarly, the adverse effects of isolation on youth and the need to limit the use of seclusion is now well recognized. (Doc. 2-1 at 8 ("There

15

is widespread and growing awareness of the harms and ineffectiveness of solitary confinement within the youth justice field and among the public at large.").)

## II.     Likelihood of Success on the Merits

The court groups the claims into three broad categories: restraint, seclusion, and response to symptoms of mental illness, primarily suicidality.  These categories overlap in individual incidents.  In each case, plaintiff has demonstrated a likelihood of succeeding on the merits through the establishment of a constitutionally-based claim of deprivation of rights.

### A.     Restraint

The parties agree that the current restraint protocol, developed by the current director of Woodside and not employed in other institutions, must be replaced.  The court agrees.  The protocol is strongly directed towards establishing control through physical means.  It does not recognize patience and persuasion as the first response.  The focus on forcing youths into the final position—arms raised behind the back, feet crossed and pushed into the buttocks—results in prolonged struggles on the floor.  That no one has been injured in these struggles is more a matter of luck than of planning.

The only issue remaining concerning restraint practices is how fast a national model can be substituted.  The state believes five months or longer may be necessary.  The court will order that the change be instituted as quickly as possible and will schedule future hearings to monitor compliance.

### B.     Seclusion

The practice of locking youths in their rooms for days or in some cases weeks on end is unreasonable.  It is a violation of the state's obligation, recognized in *Youngberg*, to balance the needs of the institution against the individual's right to be free from unnecessary limitations on

16

his or her freedom. It is likely that at trial the plaintiff will succeed in demonstrating that the youth held for extended periods of time in the North Unit were denied access to education and to a semblance of normal life among their peer group without sufficient justification. On the basis of the limited record available through a preliminary injunction hearing, it appears to the court that the practice of locking a rebellious or uncooperative youth in his or her room is a poor substitute for the therapeutic practices advocated by plaintiff's experts.

The difficulty for the court is that a preliminary injunction hearing provides scant basis for creating a new seclusion policy through a court order. Even after a full trial, it would be difficult to know how to instruct Woodside staff to proceed in a difficult individual case. Something is obviously wrong with a policy that results in long-term seclusion. The practice as described in testimony from both sides violates the liberty interests of the youth without justification by the needs of the institution.

In keeping with the emphasis in *Youngberg* for respecting the judgment and expertise of the institution, the court will order a change in the seclusion policy and turn to the parties, especially the defendant, for guidance in its development. The court orders that defendant provide a draft policy directed towards immediately reducing the use of seclusion and modifying deficiencies such as toilet flushing and access to bedding and fresh water not less than ten (10) days before the next hearing. The court anticipates that over the course of several hearings, a policy which meets constitutional standards will develop.

## C.      Treatment of Suicide Risk

The treatment of the female youth who was stripped naked and confined in a shower room is the most troubling incident before the court. The video segment is only a few minutes in length. It is shocking in several respects. The use of four hooded male officers, clothed in

17

hazmat suits, to subdue a naked young woman and force her to the floor beneath a plexiglass shield cannot represent an appropriate, professional response to her attempts to strangle herself with cords and fabric strips torn from her clothing.  Instead, the segment shows staff responding to her dangerous behavior in a manner that was both too much and too little.  The force employed was too much.  The apparent absence of a considered, medically-directed plan of treatment for a person in the midst of a mental crisis was too little.

It is not possible on the present record to make a ruling, even a preliminary decision, about whether the exigencies of the moment justified the force and restraint employed in this single incident.  The adequacy of the care provided to the young person shown in the video is measured for purposes of substantive due process on a standard of deliberate indifference.  *See Charles v. Orange Cty.*, 925 F.3d 73, 85 (2d Cir. 2019) ("Thus, those in civil detention, as were Plaintiffs in this case, are also afforded a right to be free from deliberate indifference to their serious medical needs.")  Because this case concerns claims for prospective, injunctive relief, not damages, the likely presence of a constitutional violation in this particular incident is not critical to the court's task.  Instead, the court defers ruling on whether Plaintiff has demonstrated a likelihood of success on the merits regarding the treatment of youth exhibiting symptoms of mental illness until the state has an opportunity at the next hearing to produce and explain the policy that led to this incident.

18

## **CONCLUSION**

The court GRANTS the motion (Doc. 2) will issue a preliminary injunction.  The

injunction will provide for further hearings directed at the issue of remedy and, in the case of

mental health treatment and planning, with respect to liability.

Dated at Burlington, in the District of Vermont, this ___9th___ day of August, 2019.

Geoffrey W. Crawford, Chief Judge
United States District Court

19